## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**AMERICAN BUSINESS FINANCIAL**<br>**SERVICES, INC. *et al.,*[1]**<br><br>────────────────────<br><br>**GEORGE L. MILLER, CHAPTER 7**<br>**TRUSTEE,**<br><br>                    **PLAINTIFF,**<br><br>     v.<br><br>**GREENWICH CAPITAL FINANCIAL**<br>**PRODUCTS, INC.,**<br><br>**OCWEN LOAN SERVICING, LLC,**<br><br>**WELLS FARGO BANK, N.A., individually**<br>**and as trustee and representative of**<br>**thousands of ABFS Collateralized**<br>**Noteholders,**<br><br>**LAW DEBENTURE TRUST COMPANY**<br>**OF NEW YORK, individually and as trustee**<br>**and representative of thousands of ABFS**<br>**Collateralized Noteholders,**<br><br>**THE BERKSHIRE GROUP LP, AND**<br><br>**MICHAEL W. TRICKEY,**<br><br>                    **DEFENDANTS.** | **Chapter 7**<br><br>**Case No. 05-10203 (MFW)**<br><br>**(Jointly Administered)**<br><br><br>**Adversary No.** |

## COMPLAINT

─────────────────────

[1] American Business Financial Services, Inc., Case No. 05-10203, Tiger Relocation Company, Case No. 05-10204, American Business Credit, Inc., Case No. 05-10206, Home American Credit, Inc., Case No. 05-10207, American Business Mortgage Services, Inc., Case No. 05-10208 and ABFS Consolidated Holdings, Inc., Case No. 05-10217.

# I.    **INTRODUCTION**

1.    Plaintiff, George L. Miller, the Chapter 7 Trustee (the "Trustee") of American Business Financial Services, Inc. and its subsidiaries (collectively "ABFS" or the "Debtor"), seeks in this action to recover more than $70 million for the post-bankruptcy damages inflicted on the Debtor.

2.    The Trustee's claims arise as a result of, inter alia, (a) defendants having misled and perpetrated a fraud on this Court to profit from DIP financing to a debtor that they knew had no chance of reorganizing and whose reorganization collapsed weeks later, (b) defendants having misrepresented to this Court that the Debtor's I/O Strips – collateral for the requested $500 million DIP facility – were worth $400 million while they withheld from the Court their own $90 million valuation for the same property, (c) defendants having withheld from this Court the fact that – since the I/O Strips were worth only a fraction of the amount represented – the Debtor was in default under the DIP Facility at the moment it was approved, and that the defendant lender had neither the intent nor the obligation to lend anywhere near the $500 million upon which the approval order and $15.75 million facility fee were premised, (d) the defendant lender, after misleading the Court to obtain approval of the $500 million DIP Facility, collected a $15.75 million fee, advanced less than $30 million in working capital, called the loan in two months and seized substantially all of the Debtor's property, which it then converted at less than fair value for its and Ocwen's additional benefit, and (e) the defendants having converted and refused to turnover the Debtor's property, having breached fiduciary, contractual and other duties owed to the Debtor and the Trustee, and having defrauded the Debtor and the Trustee.

## II.    PARTIES

### Plaintiff

3.     Plaintiff, George L.   Miller, is the duly appointed Chapter 7 Trustee of the bankruptcy estates of American Business Financial Services, Inc. and its subsidiaries, Tiger Relocation Company, American Business Credit, Inc., Home American Credit, Inc., American Business Mortgage Services, Inc., and ABFS Consolidated Holdings, Inc.  Plaintiff maintains an office c/o Miller Coffey Tate, LLP, 8 Penn Center, 1628 John F. Kennedy Blvd., Suite 950, Philadelphia, Pennsylvania  19103.

4.     On January 21 and 24, 2005, ABFS and the subsidiaries identified in paragraph 3 above filed voluntary petitions for relief under Chapter 11 of Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, with the cases being jointly administered under the caption, In re: American Business Financial Services, Inc., U.S.B.C. D. Del., Case No. 05-10203 (MFW).  On May 17, 2005, the ABFS bankruptcy proceedings were converted to cases under Chapter 7 of the Bankruptcy Code, and Plaintiff was appointed as Trustee of the ABFS bankruptcy estates.

5.     Plaintiff brings this action in his capacity as Trustee for the Debtors, as assignee of Clearwing Capital, LLC and Chysalis Warehouse Funding, LLC (collectively, "Clearwing"), and as assignee of The Patriot Group, LLC ("Patriot"), two of the Debtor's former secured lenders. Greenwich, Clearwing and Patriot are referred to collectively in this Complaint as the "Lenders."

### Defendants

6.     Defendant, Greenwich Capital Financial Products, Inc. ("Greenwich"), is a Delaware corporation with offices at 600 Steamboat Rd, Greenwich CT 06830.

7.     Defendant, Ocwen Loan Servicing LLC ("Ocwen"), is a Florida corporation and

successor to Ocwen Federal Bank, FSB., with offices at 1661 Worthington Road, Suite 100, PO Box 24737, West Palm Beach, Florida 33409.

8.      Defendant, Wells Fargo Bank, National Association ("Wells Fargo"), is a national banking association duly organized and existing under the laws of the United States of America, with offices at Sixth and Marquette, MAC N9303-120, Minneapolis, MN 55479.

9.      Defendant, Law Debenture Trust Company of New York ("Law Debenture"), is a New York banking corporation, with offices at 767 Third Avenue, 31st Floor, New York, NY 10017.

10.     Defendant, The Berkshire Group LP ("Berkshire"), is an entity, with offices at 553 Capital Drive, Lake Zurich, IL 60047.

11.     Defendant, Michael W. Trickey ("Trickey"), is an individual with a place of business c/o The Berkshire Group LP, 553 Capital Drive, Lake Zurich, IL 60047. At all times material hereto, Trickey was the Managing Director of Berkshire and – unknown to the Trustee – the Chief Investment Officer of Ocwen. Trickey engaged in the wrongs alleged herein on his own behalf and as agent for and on behalf of Berkshire, Ocwen and the Indenture Trustees.

## III.    JURISDICTION

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 & 157.

13.     This is a core proceeding. See 28 U.S.C. § 157(b)(2)(A), (B), (C), (D), (E), (F), (H), (K) & (O).

## IV.    FACTS

14.     ABFS was a finance company that originated, sold and serviced sub-prime mortgage loans.

15.     From 1995 through March, 2003, ABFS used public securitization transactions to

raise capital and to sell its subprime loans. ABFS transferred its loans to trusts (collectively, the "Securitization Trusts"), and the Securitization Trusts, underwritten by large Wall Street brokerage houses, sold interests in the trusts to investors. ABFS retained residual interests (collectively, the "Residual Interests") in the form of fee-producing servicing rights ("Future Servicing Rights") and subordinate interests in the cash flows generated by the securitized loans (the "I/O Strips").

16.    In addition to raising funds through securitizations, ABFS had funded its operations through the sale of subordinated notes, debentures and other debt securities (collectively, the "ABFS Subordinated Notes").

17.    Commencing sometime in or around 2000, ABFS entered the zone of insolvency or became insolvent and ABFS had a real opportunity to reorganize or liquidate, with the creditors suffering little if any loss.

18.    Rather than honestly and responsibly protecting the interests of ABFS and its creditors, certain officers and directors of ABFS – aided and assisted by national banks, financial institutions, professionals and others – caused ABFS to book more than $500 million of fictitious gains and more than $500 million of fictitious assets as part of an artifice and scheme to conceal staggering losses and continue the illusion that ABFS was a financially viable company so that the ABFS officers and directors and their enablers could continue to reap millions of dollars at the expense of ABFS and its creditors. While those defendants made tens of millions of dollars during the last five years of ABFS's existence, ABFS's insolvency wrongfully deepened by more than $750 million and ABFS collapsed leaving creditors, including more than 22,000 people – many of whom who were elderly persons that had lent ABFS their life savings – and other creditors with

losses of more than a billion dollars.[2]

19.     As a result of two exchange offers (the "Exchange Offers") effectuated in December, 2003 and June, 2004, approximately $100 million of debt was removed from ABFS's balance sheet when owners of ABFS Subordinated Notes exchanged the subordinated debentures for a combination of worthless stock and approximately $100 million of Senior Collateralized Notes (the "Collateralized Notes"), which Collateralized Notes were secured by a subordinate lien on certain of the Debtor's I/O Strips.  The ABFS debenture holders who received Collateralized Notes as part of the Exchange Offers are referred to collectively in this Complaint as the "Collateralized Noteholders."

20.     In light of the massive losses sustained during the wrongful prolonging of ABFS's business, the only way that ABFS was able to repay the ABFS Subordinated Notes that came due from time to time was by selling more notes, thereby perpetrating a Ponzi Scheme.

21.     When the SEC prohibited the further sale of notes in December, 2004, the business collapsed, and ABFS filed bankruptcy.

**The Defendants And Others Continued To Misstate
ABFS's True Financial Condition And Wasted Millions
Of Dollars In A Failed, Short-lived Reorganization Attempt**

22.     After the bankruptcy filing, the ABFS Defendants attempted desperately to retain control of the Debtor to avoid appointment of a trustee and the ensuing investigation that would no doubt uncover the massive fraud perpetrated by the ABFS Defendants and others during the

---

2       In the state-court action recently filed by the Trustee in the matter of Miller v. Santilli, et al., C.C.P. Phila. Cty., July Term, 2006, No. 001225 (filed July 13, 2006), the Trustee sued seven former officers and directors of ABFS (the "ABFS Defendants") and five nationally prominent financial institutions and demanded more than $750 Million for the damages inflicted upon ABFS in the years preceding its bankruptcy.

several years preceding the bankruptcy.

23.     Having been a pre-petition lender to the Debtor, Greenwich was intimately familiar with the Debtor's financial condition and had profited handsomely by assisting the ABFS Defendants in fraudulently prolonging the Debtor's business.

24.     Wishing to further capitalize on the prolongation of a dead business, Greenwich[3] entered into a Debtor In Possession Loan And Security Agreement dated as of February 22, 2005 (as amended, the "Loan Agreement"), and perpetrated a fraud upon this Court during the proceedings facilitating the Court's approval of the DIP financing arrangement (the "DIP Financing").

### Greenwich's Obligations Under The DIP Financing Were Illusory

25.     Pursuant to the DIP Financing, Greenwich purportedly agreed to provide a senior, secured, superpriority debtor-in-possession financing facility of up to $500,000,000, in return for a $15.75 million up-front fee, earned upon approval of the DIP Financing, interest and a security interest in all of the Debtor's property, including the Residual Interests.[4]

26.     In reality, Greenwich's $500 million commitment was illusory and Greenwich had no intent on lending anywhere near the $500 million for which the $15.75 million fee was charged.

27.     In this regard, Section 6 of the Loan Agreement contained representations and

---

3       Clearwing and Patriot had a $1 million participation in the loan (collectively, the "Clearwing/Patriot Participation").  Greenwich was designated as Clearwing's and Patriot's agent in connection with the servicing and collection of the Clearwing/Patriot Participation. The Clearwing/Patriot Participation has been assigned to the Trustee.

4       Although the Loan Agreement was dated as of February 22, 2005, it was not approved by this Court until March 9, 2005.  The Loan Agreement and other documents underlying the DIP Financing are voluminous and are therefore not attached as exhibits to this Complaint. The DIP Financing was approved by the Court and the documents and matters of record are incorporated by reference herein.

warranties concerning the financial condition of the Debtor – warranting the accuracy of the Debtor's audited consolidated balance sheets as of June 30, 2004 and unaudited consolidated balance sheets as of September 30, 2004 – and Section 5 of that agreement conditioned Greenwich's obligation to make advances on the accuracy of the warranties concerning the Debtor's financial condition as of the date of each new advance.

28.    As Greenwich was well aware, the I/O Strips were recorded on the Debtor's balance sheets at a value of approximately $400 million, when in reality they were worth only a fraction of that amount.

29.    While Greenwich was representing to this Court the accuracy of the Debtor's $400 million valuation of the I/O Strips, a representation which was critical to this Court's approval of the DIP Financing – Greenwich's own internal valuation, which was intentionally withheld from the Court, placed the value at less than $90 million.

30.    After misleading this Court to obtain approval of the DIP Financing, Greenwich collected its $15.75 million fee, advanced less than $30 million in working capital, and called the loan in two months.

31.    In short, the DIP Financing was procured as part of a fraud upon the Court and the creditors of ABFS, and ABFS incurred more than $20 million of expenses for the illusory opportunity to borrow monies that Greenwich had no intent nor obligation to lend.

**The Indenture Trustees Sold Out After Being Paid By Greenwich**

32.    On February 1, 2005, US Bank, the original indenture trustee for the Collateralized Noteholders, filed objections to the approval of the DIP Financing and to the use of cash collateral (collectively, the "Objections"), on the grounds that, inter alia, (a) the I/O Strips were worth only a fraction of the amounts recorded on the books, (b) the Debtor's reorganization plan had no

legitimate prospect of succeeding since it was premised upon patently unreasonable financial projections (requiring the Debtor to originate new mortgage loans at a rate 2-3 times higher than that achieved in the history of ABFS), (c) the fees associated with the DIP Financing were excessive, and (d) the lack of adequate protection for the Collateralized Noteholders.

33.    The Objections were right on point and should have been pursued.

34.    Shortly after it filed the Objections, US Bank withdrew as the indenture trustee for the Collateralized Noteholders and was replaced by Wells Fargo and Law Debenture.

35.    On February 8, 2005, Law Debenture acknowledged of record its status as successor indenture trustee, and joined in the Objections.

36.    In breach of their fiduciary responsibilities to the Collateralized Noteholders, in breach of their contractual obligations to the Collateralized Noteholders under the respective trust indentures, and in breach of their fiduciary responsibilities to the Debtor and its creditors (as a result of their status as secured creditors with control over the Debtor's property), the Indenture Trustees sold out, agreed to accept payment of approximately $1.4 million from Greenwich, and in return withdrew the Objections and aided and abetted the fraud perpetrated on the Court.

**Before The Ink Was Dry On The Order Approving The DIP Financing, The DIP Financing Went Into Default And Terminated And Greenwich And Ocwen Then Proceeded To Convert The Debtor's Property**

37.    Pursuant to the DIP Financing, ABFS was required to engage a Chief Restructuring Officer (the "CRO").

38.    Almost immediately after beginning his due diligence, the CRO determined that ABFS had no chance of reorganizing, and that ABFS had been in default of the Loan Agreement from day one.

39.    On April 4, 2005 – less than four weeks after this Court's approval of the DIP

Financing – ABFS announced publicly that its reorganization effort had failed, and that ABFS's new CRO had already began dismantling the company and shutting down the business.

40.    On May 13, 2005, having waited until it received $20 million in connection with the sale of certain property of the Debtor, Greenwich declared the Loan Agreement in default, suspended further advances, and accelerated the debt. A copy of Greenwich's default and acceleration notice of May 13, 2005 is attached to this Complaint as Exhibit A.[5]

41.    Upon the declaration of default, acceleration of the Loan and termination of the Loan Agreement, Greenwich was obligated to act reasonably and in good faith in order to maximize and preserve the collateral – i.e., the I/O Strips and the Debtor's other property – for the benefit of Greenwich's co-lenders Clearwing and Patriot, and for the benefit of the Debtor and its creditors.

42.    Rather than preserving, liquidating and maximizing the value of the collateral, Greenwich embarked on a "loan to own strategy," wasting and then converting the Debtor's property.

43.    Greenwich wrongly collected exorbitant default rate interest and fees from the cash flow generated from the I/O Strips and other property of the Debtor, while Greenwich and Ocwen carried out a scheme which had the intent to convert and resulted in the theft and conversion of the Debtor's property for the benefit of Greenwich and Ocwen.

44.    Had Greenwich preserved, protected and reasonably liquidated the collateral under

_____

5    Under the Loan Agreement and DIP Financing documents, the Debtor's overvaluation of the I/O Strips, the Debtor's cessation of normal business activities, the liquidation of the Debtor's business, the appointment of a trustee and/or the conversion of the cases were defaults resulting in the termination of the loan facility and the acceleration of the debt. Moreover, since Greenwich had obtained relief from the automatic stay as part of the DIP Financing, the Debtor and its creditors were left even more vulnerable.

its possession and control, Greenwich would have been repaid shortly after the conversion to Chapter 7 (the "Deemed Repayment Date"), and the remaining collateral – then worth in excess of $30 million – would have been returned to and available for the benefit of the Debtor and its creditors.

45.    After the conversion of the case and the appointment of the Trustee, Greenwich took possession and control of the Debtor's property, including the I/O Strips, and Greenwich permitted the Trustee only minimal use of cash collateral, and restricted that use so that the Trustee did not have the resources to fully enforce his rights with Greenwich, Ocwen, the Indenture Trustees or others acting in concert with Greenwich.

46.    Upon the conversion of the case and the appointment of the Trustee, Greenwich and the Indenture Trustees (a) had possession and control of the Debtor's property which served as collateral for the monies advanced under the DIP Financing and the obligations to the Collateralized Noteholders, (b) retained the proceeds of and cash flow from the I/O Strips and other property of the Debtor, (c) refused to properly service, manage, preserve and protect the Debtor's property, including the I/O Strips, (d) wasted the Debtor's property including the I/O Strips, and (e) participated in and aided, abetted, and benefitted from the conversion of the Debtor's property, including the I/O Strips.

47.    On or about July 20, 2006, Greenwich and the Trustee entered into a Conditional Consent and Undertaking (the "Undertaking Agreement") pursuant to which the Trustee sold certain property of the Debtor, which contained among other provisions a release to the benefit of Greenwich (the "Greenwich Release").

48.    The Undertaking Agreement was conditioned upon the approval of the Court and this Court approved the agreement on or about August 19, 2005.

49.    The Trustee avers that Greenwich obtained court approval of the Undertaking Agreement as part of its continued deception and fraud upon the Court, and the Trustee requests that the Court enter an order vacating the approval of the Undertaking Agreement and declaring the Undertaking Agreement null and void.

50.    The Trustee avers that the Greenwich Release was procured by fraud and should be rescinded and invalidated by this Court.  The fraud included, but was not limited to, misleading the Trustee and the Court as to the value of the I/O Strips, misleading and concealing from the Court and the Trustee Trickey's relationship to Ocwen and the conspiracy of Greenwich and Ocwen, as hereinafter set forth, to convert the Debtor's property.

51.    By letter dated July 19, 2006 (the "Accounting Demand"), the Trustee demanded a full and complete accounting from Greenwich.  A copy of the Accounting Demand is attached to this Complaint as Exhibit B.

52.    As of this date, no such accounting has been provided.

**The Wrongdoing With Respect To The Debtor's Future Servicing Rights**

53.    Under the approved DIP Financing, the Debtor was required to sell its loan servicing portfolio and Future Servicing Rights.

54.    To protect its exorbitant fees and to facilitate its ultimate goal of "owning" the Debtor's property without paying for it, Greenwich facilitated and financed Ocwen's purchase of the Debtor's Future Servicing Rights and both Greenwich and Ocwen wrongly discouraged other potential bidders.

55.    On or about April 13, 2005, Ocwen entered into an agreement to purchase the Future Servicing Rights (the "Servicing Rights and Transfer Agreement") and assumed the servicing contracts with most of the Securitization Trusts.

56.    Ocwen committed a fraud against the Debtor when it entered into the Servicing Rights and Transfer Agreement because (a) it never intended to honor the agreement or to pay the purchase price, (b) it had conspired with Greenwich to suppress the bidding for the Future Servicing Rights, and, (c) it had conspired with Greenwich and had agreed to assist Greenwich to take and convert the Debtor's property, including the I/O Strips, for the benefit of Greenwich and Ocwen.

57.    Ocwen outwardly "agreed" to pay approximately $21 million for the Future Servicing Rights to discourage other bidders from purchasing these rights, but intended from the start to breach that agreement and to concoct excuses and not pay in full when the time for payment arrived.

### Ocwen's Violation Of The Holdback

58.    Under the Servicing Rights Transfer Agreement, a $2.8 million dollar holdback was to be paid to ABFS 45 days after the closing date and a $1.75 million holdback was to be paid in May, 2005 (collectively, the "holdback").

59.    The time for payment of the holdback has long expired, Ocwen's proffered excuses for refusing to pay and turnover the holdback are in bad faith and without merit, and the sum of $3.4 million plus interest remains past due and owing.

### Ocwen's Breach Of The Prepayment Penalty Provision

60.    Under §5.05 of the Servicing Rights Transfer Agreement, Ocwen was obligated to transfer and remit to the Debtor all prepayment penalties collected by Ocwen in connection with its mortgage loan servicing activities.

61.    In breach of its obligations under the Servicing Rights Transfer Agreement, in breach of its obligations under applicable bankruptcy law, and without notice to or approval from

the Trustee or the Court, Ocwen converted and transferred some or all of the collected prepayment penalties – which were and are property of the Debtor's estate – to Greenwich.

62.    As a result of Ocwen's wrongdoing with respect to the collection, retention and transfer to Greenwich of prepayment penalties that belonged to the Debtor, the Debtor has suffered damages which have yet to be fully determined but which exceed $2 million.

### Ocwen's Improper Reimbursements For Advances

63.    In connection with its purchase of the Debtor's servicing rights and pursuant to the Servicing Rights Transfer Agreement, Ocwen became party to the eighteen servicing agreements with the Securitization Trusts, and the parties entered into agreements entitled either Amended and Restated Pooling and Servicing Agreement or Amended and Restated  Sale and Servicing Agreement (collectively, the "Servicing Agreements").

64.    Under the Servicing Agreements, Ocwen was obligated to advance certain funds (the "Periodic Advances") to the Securitization Trusts each month for those mortgage loans whose monthly payment was delinquent, and Ocwen was entitled to reimbursement for Periodic Advances in accordance with §5.03 of each Servicing Agreement.

65.    In seventeen of the Servicing Agreements, reimbursement for Periodic Advances was limited to circumstances when (a) additional payments were made on the mortgage for which an advance was made (§5.03(e)), or (b) when the servicer received funds from insurance, liquidation, repurchase or substitution adjustment of the mortgage loan for which an advance was made (§5.03(d)).

66.    Section 5.03(e) of one of the Servicing Agreements – the agreement with ABFS Mortgage Loan Trust 1998-3 (the "1998-3 Servicing Agreement") – permitted Ocwen to reimburse itself for Periodic Advances out of general collections, without regard to the particular mortgage

for which the advance or collection was made or received.

67.    Upon information and belief, since the servicing transfer date, Ocwen has reimbursed itself for Periodic Advances in breach of the applicable Servicing Agreements with respect to all of the Servicing Agreements whose provisions differ from those contained in the 1998-3 Servicing Agreement.

68.    As a result of Ocwen's breach of the reimbursement provisions of the Servicing Agreements, the Debtor has suffered damages which have yet to be determined.

### Ocwen's Failure To Properly Service The Loan Portfolios

69.    Incident to its relationship as servicer of the I/O Strips, and in accordance with its obligations under the Servicing Rights Transfer Agreement and the Servicing Agreements, Ocwen was obligated, among other things, (a) to make reasonable efforts to maximize and collect all payments called for under the mortgage loans underlying the I/O Strips (the "Mortgage Loans"), (b) to comply with mortgage serving practices of prudent mortgage lending institutions which service, for their own account, mortgage loans of the same type as the Mortgage Loans, and (c) to make reasonable efforts and follow prudent practices in its collection efforts, including disposition of delinquent loans, foreclosure activities and disposition of real estate.

70.    Since the cash flow and value of the I/O Strips was impacted substantially by the servicing activities of Ocwen, and since Greenwich and the Indenture Trustees had possession and control of the I/O Strips in their capacities as secured creditors, the Trustee, in June 2005, requested the consent of various parties, including Greenwich and the Indenture Trustees to hire a professional to manage and preserve the value of the I/O Strips.

71.    The Indenture Trustees and Greenwich denied consent, and represented to the Trustee that Trickey and Berkshire had been engaged by the Indenture Trustees to "manage" the

I/O Strips and that Trickey and Berkshire would perform that oversight function for the benefit of the Trustee and the Debtor.

72.    In reliance upon the representations of the Indenture Trustees and Greenwich, the Trustee took Trickey into his confidence, had Trickey represent and act on the Trustee's behalf in dealing with Ocwen to resolve the Trustee's concerns with respect to the proper servicing of the Mortgage Loans and I/O Strips, and paid Berkshire more than $68,000 (of a $175,000 bill) from the limited available funds of the estate.

73.    At all times material hereto, the Trustee was misled by the Indenture Trustees, Greenwich, Berkshire, Trickey and Ocwen into believing that Trickey was acting as watch-dog for the Trustee and protecting the interests of the Debtor and its creditors, when in fact the opposite was true. In reality, Trickey was the proverbial "wolf in sheep's clothing."

74.    During the next several months, the Trustee observed and complained about an almost complete abdication by Ocwen of its obligations to service the Mortgage Loans, which resulted in substantial harm to the Debtor as a result of, among other things, increased delinquency rates, depressed value and waste of the I/O Strips, and effective elimination of the cash flow that would otherwise have been generated.

75.    As a result of the deteriorating condition of the I/O Strips, the Trustee began an investigation of Trickey, and the services he was allegedly providing in overseeing Ocwen and "managing" the I/O Strips.

76.    The investigation revealed that Trickey was not acting to protect the Debtor in managing the I/O Strips, but to the contrary, was the Chief Investment Officer of Ocwen acting in a manner contrary to the interests of the Debtor.

77.    The Trustee informed Greenwich and the Indenture Trustees of the

misrepresentation concerning the status and loyalties of Trickey, as well as the conflict of interest of their chosen "manager" of the I/O Strips, only to learn that both Greenwich and the Indenture Trustees had been aware of the relationship since at least April, 2005, and had intentionally concealed that information from the Trustee.

78.     Notwithstanding that the Trustee repeatedly advised Greenwich and the Indenture Trustees of Ocwen's wrongdoing, Greenwich and the Indenture Trustees ignored the Trustee and took no action to protect or preserve the I/O Strips.

79.     When the Trustee expressed his complaints directly to Ocwen, Ocwen ignored and stone-walled the Trustee, repeatedly advising that it took instruction only from Greenwich.

### The Sham I/O Strip Auction And Conversion Of The Debtor's Property

80.     Greenwich and Ocwen conspired and agreed to negatively impact and temporarily suppress the cash flow from and value of the I/O Strips to afford them an opportunity to convert and acquire for their own benefit the I/O Strips.

81.     Sometime in or around early 2006, Greenwich informed the Trustee that it intended to foreclose on 13 of the 19 remaining I/O Strips ("the 13 I/O Strips") and to sell the 13 I/O Strips at public auction (the "Auction").

82.     The Auction was originally scheduled for June 15, 2006, was twice delayed by the conduct of Greenwich and Ocwen and finally took place on June 28, 2006.

83.     During the period leading up to the Auction, Greenwich and Ocwen acted in bad faith and in violation of their contractual and other duties to the Debtor by, among other things, refusing to provide financial and other information to potential outside bidders in an effort to suppress the bidding, and by failing to service and collect the underlying Mortgage Loans so that the I/O Strips would appear less valuable to outsiders with a potential interest in acquiring the 13

I/O Strips.

84.    As a result of the wrongdoing of the Defendants, the 13 I/O Strips were wasted and devalued to the tune of millions of dollars prior to the Auction.

85.    Nevertheless, the outstanding balances of the Mortgage Loans underlying the 13 I/O Strips exceeded $360 million and the 13 I/O Strips themselves were worth in excess of $20 million  at the time of the Auction.

86.    The Auction conducted on June 28, 2006 was a sham, and the culmination of an unlawful effort and conspiracy by and between Ocwen and Greenwich to convert the Debtor's property.

87.    Incredibly, a disinterested bidder declared publicly at the Auction that it was terminating its bidding because Ocwen had denied repeated requests to provide the financial information necessary to properly value the 13 I/O Strips.

88.    With all opposition withdrawn, Greenwich then "sold" the 13 I/O Strips to Ocwen for $5.1 million, an amount substantially less than their actual value.

89.    The "sale" of the 13 I/O Strips was commercially unreasonable.

**The Indenture Trustees' Alleged Diminution Claim**

90.    Although no formal claim has been filed with the Court, and although no formal claim or demand has been served upon the Trustee, the Indenture Trustees have intimated – no doubt in the context of their unsuccessful efforts to obtain a release from the Trustee – that the Trustee has used and diminished the Indenture Trustee's cash collateral and that the Indenture Trustees have claims against the Trustee.

91.    The Trustee disputes any such claim and requests that the Court declare that the Indenture Trustees have no diminution or other claims against the Trustee.

**The Collateralized Noteholders' Claims Are**
**Unsubstantiated And Should be Disallowed**

92.     On or about August 4, 2005, Law Debenture filed a proof of claim in the amount

of not less than $57,019,180 on behalf of the Collateralized Noteholders who purchased

Collateralized Notes in connection with the ABFS exchange offer effective in December, 2003 (the

"Law Debenture Proof of Claim"). A copy of the Law Debenture Proof of Claim is attached to this

Complaint as Exhibit C.

93.     On or about August 5, 2005, Wells Fargo filed a proof of claim in the amount of

$41,130,505 on behalf of the Collateralized Noteholders who purchased Collateralized Notes in

connection with the ABFS exchange offer effective in June, 2004 (the "Wells Fargo Proof of

Claim"). A copy of the Wells Fargo Proof of Claim is attached to this Complaint as Exhibit D.

94.     In a pleading filed in this Court – Docket entry # 99 – US Bank, the predecessor

trustee for the Collateralized Noteholders, conceded that it did not have independent records as to

the outstanding debt due on the Collateralized Notes.

95.     Since the Indenture Trustees provided no back-up to substantiate or support the

amounts claimed, and since the Indenture Trustees' predecessor admitted having no such

information, the Trustee objects to the Law Debenture Proof of Claim, the Wells Fargo Proof of

Claim, and to the Indenture Trustees' claims on behalf of the Collateralized Noteholders as

unsubstantiated in whole or in part.

**Joint Responsibility And Damages**

96.     Each of the Defendants caused, participated in and aided and abetted the other

Defendants in committing the wrongs alleged herein.

97.     The conduct of the Defendants, as aforesaid, was intentional, engaged in for an

improper purpose and with a bad motive, and was sufficiently outrageous to justify the imposition of punitive damages.

98.    As a result of the wrongdoing of the Defendants, the Debtor has suffered damages in excess of $70 million.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM - TURNOVER
### (Against Greenwich and Ocwen)

99.    Paragraphs 1 through 98 above are incorporated herein by reference, as though set forth in full.

100.    Pursuant to 11 U.S.C. § 542(a), any entity which possesses property that the trustee may use, sell or lease under 11 U.S.C. § 363 is obligated to deliver the property to the trustee.

101.    The 13 I/O Strips were wrongly converted, constitute property of the Debtor and should be delivered to the Trustee.

102.    The interest and fees collected by Greenwich post conversion should not have been collected, constitute property of the Debtor and should be delivered to the Trustee.

103.    The holdback, prepayment penalties and other sums wrongfully paid to or retained by Greenwich and Ocwen constitute property of the Debtor and should be delivered to the Trustee.

104.    The remaining I/O Strips (in addition to the 13 I/O Strips) and all other collateral pledged as security for the DIP Financing in the possession or control of Greenwich constitute property of the Debtor and should be delivered to the Trustee.

## SECOND CLAIM - FRAUDULENT TRANSFERS

**(Under Sections 549 & 550 of the Bankruptcy Code Against all Defendants)**

105.    Paragraphs 1 through 104 above are incorporated herein by reference, as though set forth in full.

106.    The Defendants orchestrated, participated in and/or aided and abetted the fraudulent transfers of the Debtor's property (collectively, the "Transfers"), including the $15.75 million fee paid to Greenwich, the interest and other sums paid to Greenwich, the transfers of the 13 I/O Strips, the cash flow from the I/O strips, the balance of the holdback, the payment of fees to Berkshire, the payment of fees to the Indenture Trustees, and the prepayment penalties and other sums to which the Debtor was entitled, all of which were improperly transferred to and retained by the Defendants.

107.    The Defendants made the Transfers with the intent to hinder, delay and/or defraud the Debtor and its creditors.

108.    The Defendants orchestrated, participated in and/or aided and abetted the Transfers for their own benefit.

109.    The Debtor failed to receive reasonably equivalent value in exchange for the Transfers.

110.    The Transfers – made when the Debtor was insolvent – constituted fraudulent transfers for which the Defendants are jointly and severally liable.

111.    As a result of the fraudulent Transfers, the Trustee is entitled to recover against the Defendants, jointly and severally (i) compensatory damages for an amount equal to the value of

all property transferred that cannot be returned, plus interest, (ii) compensatory damages for an amount equal to all profits made or sums received on account of the use of the Debtor's property, including all cash flow from the I/O Strips, plus interest, (iii) the return of the 13 I/O Strips, and, (iv) the return of the remaining I/O Strips.

112.    With respect to a particular Transfer some or all of the Defendants are liable as transferees or beneficiaries of the Transfer, and the remaining Defendants provided substantial assistance in connection with, benefitted from and aided and abetted the transfer.  Any Defendant not liable as a transferee or beneficiary of a Transfer is liable for aiding and abetting the commission of the fraudulent Transfer.

113.    Accordingly, the Trustee demands relief under Sections 549 and 550 of the Bankruptcy Code for the post petition Transfers complained of herein.

## THIRD CLAIM  - FRAUDULENT TRANSFERS
### (Under State Law Against all Defendants)

114.    Paragraphs 1 through 113 above are incorporated herein by reference, as though set forth in full.

115.    The Defendants orchestrated, participated in and/or aided and abetted the Transfers with the intent to hinder, delay and/or defraud the Debtor and its creditors.

116.    The Defendants orchestrated, participated in and/or aided and abetted the Transfers for their own benefit.

117.    The Debtor failed to receive reasonably equivalent value in exchange for the Transfers.

118.    The Transfers – made when the Debtor was insolvent – constituted fraudulent transfers for which the Defendants are jointly and severally liable .

119.    As a result of the fraudulent transfers, the Trustee is entitled to recover against the Defendants, jointly and severally (i) compensatory damages for an amount equal to the value of all property transferred that cannot be returned, plus interest, (ii) compensatory damages for an amount equal to all profits made or sums received on account of the use of the Debtor's property, including all cash flow from the I/O Strips, plus interest, (iii) the return of the 13 I/O Strips, and, (iv) the return of the remaining I/O Strips.

120.    With respect to a particular Transfer some or all of the Defendants are liable as transferees or beneficiaries of the Transfer, and the remaining Defendants provided substantial assistance in connection with, benefitted from and aided and abetted the transfer.  Any Defendant not liable as a transferee is liable for aiding and abetting the commission of the fraudulent transfers.

121.    Accordingly, the Trustee demands relief under applicable state law for the post petition Transfers complained of herein.

## FOURTH CLAIM - REQUEST FOR ACCOUNTING
### (Against Greenwich and Ocwen)

122.    Paragraphs 1 through 121 above are incorporated herein by reference, as though set forth in full.

123.    Greenwich and Ocwen have failed and refused to account to the Trustee as relates to the transactions complained of herein.

124. Accordingly, the Trustee demands an accounting, with supporting documentation, of all post-petition transactions between Greenwich and the Debtor and/or the Securitization Trusts, between Ocwen and the Debtor and/or the Securitization Trusts, and between Ocwen and Greenwich as relates to the Debtor and/or the Securitization Trusts, including but not limited to an accounting of (i) each payment or advance of funds to or on behalf of the Debtor under the DIP Financing, (ii) each repayment of funds advanced under the DIP Financing, (iii) each fee or other expenses charged to the Debtor under the DIP Financing, (iv) the outstanding balance under the DIP Financing each month, (v) all advances to or on behalf of the Securitization Trusts, (vi) all sums and other property received from the Securitization Trusts, (vii) all sums and other property received by Greenwich from Ocwen, (viii) all sums received by Greenwich and/or Ocwen from or relating to the Debtor, the Securitization Trusts, the I/O Strips and/or the Mortgage Loans, and (ix) the documents and information requested in the Accounting Demand.

## FIFTH CLAIM - BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

125. Paragraphs 1 through 124 above are incorporated herein by reference, as though set forth in full.

126. In their capacities as secured creditors with possession and control over property of the Debtor, Greenwich and the Indenture Trustees owed fiduciary duties to the Debtor, including the duty to protect, preserve, and maximize the value of the Debtor's property, including the I/O Strips and the cash flow and other sums incident thereto or derived therefrom.

127. In their capacity as representatives or agents of the Trustee, Trickey and Berkshire owed fiduciary duties to the Debtor, including duties of honesty and loyalty.

128.    In its capacity as a loan servicer for property of the Debtor, Ocwen owed fiduciary duties to the Debtor, including duties of honesty, and fair dealing.

129.    The conduct of the Defendants as aforesaid constituted a breach of the Defendants' fiduciary duties to the Debtor.

130.    As a result of the Defendants' breach of their fiduciary duties, the Debtor suffered the damages previously alleged.

## SIXTH CLAIM - AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

131.    Paragraphs 1 through 130 above are incorporated herein by reference, as though set forth in full.

132.    If and to the extent that any Defendant is found not to have had a fiduciary duty to the Debtor or the Trustee at the time of the conduct complained of herein, each such Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duty by one or more of the other Defendants possessing such duties at the relevant times.  Each non fiduciary Defendant substantially and knowingly participated in, benefitted from and aided and abetted the breach of fiduciary duty engaged in by those Defendants possessing such duties at the relevant times.

133.    As a result of the Defendants' aiding and abetting the breach of fiduciary duties, the Debtor suffered the damages previously alleged.

## SEVENTH CLAIM - BREACH OF CONTRACT
### (Against Greenwich, Ocwen and the Indenture Trustees)

134.    Paragraphs 1 through 133 above are incorporated herein by reference, as though set forth in full.

135.    The conduct of Greenwich, Ocwen and the Indenture Trustees constitutes a breach by each such Defendant of their contractual obligations to the Debtor and the Trustee under the applicable contracts, including but not limited to the DIP Financing, Loan Agreement,  and other agreements incident to the DIP Financing, the Servicing Rights Transfer Agreement, the Servicing Agreements, and the trust indentures and agreements with the Indenture Trustees.

136.    As a result of the Defendants' breach of contract, the Debtor suffered the damages previously alleged.

### EIGHTH CLAIM  - COMMON LAW FRAUD
### (Against All Defendants)

137.    Paragraphs 1 through 136 above are incorporated herein by reference, as though set forth in full.

138.    The conduct of the Defendants as aforesaid constituted fraud and deceit.

139.    To the extent that any Defendant did not directly commit fraud and deceit, they had knowledge of and substantially participated in the wrongdoing and are therefor liable for aiding and abetting the frauds of the other Defendants.

140.    As a result of the Defendants' fraud and deceit, the Debtor suffered the damages previously alleged.

### NINTH CLAIM  - CIVIL CONSPIRACY
### (Against All Defendants)

141.    Paragraphs 1 through 140 above are incorporated herein by reference, as though set forth in full.

142.    The Defendants conspired with each other, and others, in an effort to perpetrate,

facilitate, and aid and abet the frauds and other wrongs alleged herein.

143.    The Defendants undertook substantial overt acts, as aforesaid, in furtherance of the conspiracy alleged herein and are liable for the damage and harm to the Debtor.

144.    As a result of the Defendants' conspiracy, the Debtor suffered the damages previously alleged.

## TENTH CLAIM - CONVERSION
### (Against Greenwich and Ocwen)

145.    Paragraphs 1 through 144 above are incorporated herein by reference, as though set forth in full.

146.    The conduct of the Greenwich and Ocwen as aforesaid constituted conversion of the Debtor's property, including but not limited to conversion of (a) the 13 I/O Strips, (b) the remaining I/O Strips, (c) the cash flow from the I/O Strips, (d) the holdback and, (e) other sums and property that belong to the Debtor.

147.    As a result of the conversion of the Debtor's property, the Debtor suffered the damages previously alleged.

## ELEVENTH CLAIM - OBJECTIONS AND SUBORDINATION
### (Against All Defendants)

148.    Paragraphs 1 through 147 above are incorporated herein by reference, as though set forth in full.

149.    The wrongdoing and inequitable conduct of each Defendant necessitates that the right of set off be denied and that the claim be subordinated to the claims of all other creditors of the Debtor pursuant to 11 U.S.C. ¶510(c) and the equitable powers of the Court.

150.    As a result of the Defendants' breach of fiduciary duty, inequitable conduct and other wrongdoing, as aforesaid, (i) the Court should declare null and void the sale and transfer of the 13 I/O Strips, (ii) the Court should deny Defendants any right of set-off or recoupment against the claims asserted by the Trustee in this litigation, (iii) the Court should disallow any and all claims of the Defendants against the Debtor, and/or (iv) the Court should equitably subordinate any and all claims of the Defendants until all other claims against the Debtor have been satisfied.

## TWELFTH CLAIM - OBJECTION TO CLAIMS
### (Against Collateralized Noteholders)

151.    Paragraphs 1 through 150 above are incorporated herein by reference, as though set forth in full.

152.    For the reasons previously set forth, the Trustee objects to the Law Debenture Proof of Claim, the Wells Fargo Proof of Claim and to the claims asserted by the Indenture Trustees on behalf of the Collateralized Noteholders.

## THIRTEENTH CLAIM - REQUEST FOR DECLARATORY RELIEF
### (Against All Defendants)

153.    Paragraphs 1 through 152 above are incorporated herein by reference, as though set forth in full.

154.    A dispute exists as to the rights and obligations of the parties.

155.    The Court should grant Plaintiff declaratory relief, including declarations to the effect that (a) the DIP Financing was procured by fraud and should be vacated, (b) the Undertaking Agreement and Greenwich Release were procured by fraud and should be declared rescinded and invalidated, (c) the DIP Financing and Loan Agreement were repaid in full as of the Deemed

Repayment Date, (d) Greenwich breached its obligation to return to the Trustee the I/O Strips and all other property of the Debtors existing as of the Deemed Repayment Date, (e) the Auction was commercially unreasonable and the product of Greenwich's and Ocwen's breach of fiduciary duty and other wrongdoing, (f) Ocwen must return to the Trustee the 13 I/O Strips and all cash flow and other sums received on account of the 13 I/O Strips , (g) all sums collected by Greenwich and all property of the Debtor taken by Greenwich after the Deemed Repayment Date were wrongly taken and must be repaid or returned to the Trustee, (h) all property of the Debtor still in the possession or under the control of Greenwich, including the I/O Strips, were wrongly taken and must be repaid or returned to the Trustee, (i) the Trustee has not diminished the cash collateral of the Indenture Trustees and the Indenture Trustees have no diminution or other claims against the Trustee, (j) Defendants are denied the right of set-off or recoupment against the claims asserted by the Trustee in this litigation, (k) any and all claims of the Defendants against the Debtor are disallowed, and (l) any and all claims of the Defendants are equitably subordinated below and should not be allowed or paid until all other claims against the Debtor have been satisfied.

## VI.    **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff, George L. Miller, Chapter 7 Trustee of American Business Financial Services, Inc. and its above-referenced subsidiaries, demands judgment in his favor and against Defendants, Greenwich Capital Financial Products, Inc., Ocwen Loan Servicing LLC, Wells Fargo Bank, National Association, Law Debenture Trust Company of New York, The Berkshire Group LP, and Michael W. Trickey, and that the Court award the Plaintiff the following relief:

(i)    The entry of judgment in favor of the Plaintiff and against the Defendants, jointly

and severally, for compensatory damages in excess of $70 million;

(ii)    The entry of judgment in favor of the Plaintiff and against the Defendants, jointly and severally, for punitive damages;

(iii)    The entry of an order in favor of the Plaintiff and against each Defendant in possession and control of the Debtor's property and directing that each such Defendant turn the property over to the Trustee;

(iv)    The entry of an order in favor of the Plaintiff and against Greenwich and Ocwen directing a full and complete accounting, with supporting documentation, as previously requested;

(v)    Declaratory relief as requested above;

(vi)    Reasonable attorneys' fees and costs; and,

(vii)    Such additional relief as the Court deems just.

**KAUFMAN, COREN & RESS, P.C.**

**OBERMAYER REBMANN MAXWELL & HIPPEL LLP**

_____/s/_____

**STEVEN M. COREN**
(*Pro Hac Vice*)
**JOHN W. MORRIS**
(*Pro Hac Vice*)
**DAVID DORMONT**
(*Pro Hac Vice*)

**1717 Arch Street, Suite 3710**
**Philadelphia, PA 19103**
**Tele: (215) 735-8700**

**Co-Counsel for Plaintiff**

_____/s/_____

**DEIRDRE M. RICHARDS (#4191)**
**JOSEPH J. MCGOVERN**
(*Pro Hac Vice*)
**LAWRENCE J. TABAS**
(*Pro Hac Vice*)

**3 Mill Road, Suite 306 A**
**Wilmington, DE 19806**
**(302) 465-8154**

**Co-Counsel for Plaintiff**

Dated: September 13, 2006

G:\Docs\MILLER, GEORGE TRUSTEE\ABFS\Ocwen-Greenwich\Complaint.smcrevised2.9-12-06.wpd

# EXHIBIT A

## AMENDED AND RESTATED NOTICE OF DEFAULT / ACCELERATION

May 13, 2005

American Business Financial Services, Inc.
and the other Borrowers party to the Credit Agreement
referred to below
c/o American Business Financial Services, Inc.
The Wanamaker Building
100 Penn Square East
Philadelphia, PA 19107
Attention: Steve Giroux, Esq., General Counsel
Telecopier No.: (215) 940-3299

Re:     Credit Agreement (as amended, the "Credit Agreement"), dated as of
February 22, 2005, among American Business Financial Services, Inc., as a
debtor and a debtor-in-possession (the "Administrative Borrower"), the affiliates
of the Administrative Borrower listed on the signature pages thereto, each as a
debtor and a debtor-in-possession, the lenders party thereto, Greenwich Capital
Financial Products, Inc., as Administrative Agent and Co-Lead Arranger (the
"Agent"), and The CIT Group/Business Credit, Inc., as Syndication Agent and
Co-Lead Arranger

Ladies and Gentlemen:

All capitalized terms used in this notice shall have the respective meanings given such
terms in the Credit Agreement.  The Notice of Default / Acceleration previously delivered to the
Borrowers by the Agent on the date hereof is hereby amended and restated as set forth herein.

Events of Default exist under Section 8 of the Credit Agreement as a result of the
Borrowers' noncompliance with various provisions of the Credit Agreement, including, without
limitation, (a) Events of Default under clause (g)(i) of Section 8 of the Credit Agreement as a
result of a failure to comply with Section 7.35 and Section 7.39 of the Credit Agreement, (b) an
Event of Default under clause (g)(ii) of Section 8 of the Credit Agreement as a result of a failure
to provide notice of any Event of Default, as required under Section 7.09(a) of the Credit
Agreement, and (c) an Event of Default under clause (r) of Section 8 of the Credit Agreement as
a result of the cessation of certain material business operations.  Pursuant to Section 9 of the
Credit Agreement and the Final Order, effective three (3) Business Days' from the date of this
notice, the Agent hereby terminates all Commitments and declares the principal amount of the
Advances then outstanding to be immediately due and payable, together with all interest and
other amounts payable under the Credit Agreement.  Effective three (3) Business Days' from the
date of this notice, the Agent demands immediate payment in full of the Obligations and the
outstanding balance of the Obligations is hereby immediately due and payable, without further
order of, or application to, the Bankruptcy Court.

Effective beginning three (3) Business Days' from the date of this notice, interest on all
Obligations shall accrue at the Post-Default Rate until such Obligations are paid in full, and the

Agent may exercise and intends to commence to enforce any and all rights and remedies provided for in the Credit Agreement, the Orders and the other Loan Documents and under applicable law (including, but not limited to, the Bankruptcy Code).  As provided for in clause (b) of Section 9 of the Credit Agreement, the Agent has the right to obtain physical possession of the Servicing Records and all other files of the Borrowers relating to the Collateral and all documents relating to the Collateral which are now or may hereafter come in to the possession of the Borrowers or any third party acting for the Borrowers and the Borrowers shall deliver to the Agent such assignments as the Agent shall request.

This notice constitutes a Priority Triggering Event under the Credit Agreement.  In addition, this notice serves as notice for purposes of the Orders and the Credit Agreement that, at anytime beginning three (3) Business Days' from the date of this notice, the Agent may consummate foreclosure on the Collateral or otherwise seize control of assets of the Borrowers' Estates (as such term is defined in the Bankruptcy Code) and exercise any and all rights and remedies allowed under the Loan Documents.

Nothing contained in this notice or in any other communications between or among the Agent, the Lenders and the Borrowers shall be deemed to constitute or shall be construed as (i) a waiver or release of any of the Agent's or any Lender's rights or remedies against any Borrower or any other party to the Loan Documents or pursuant to applicable law or (ii) a course of dealing obligating the Agent or any Lender to provide any accommodations, financial or otherwise, to any Borrower at any time.  Nothing contained in this letter shall confer on any Borrower or any other person or entity any right to other or further notice or to cure periods with respect to any Event of Default.  The Agent hereby expressly reserves and preserves all of the rights and remedies of the Agent and each Lender under the Loan Documents and applicable law.

Sincerely,

GREENWICH CAPITAL FINANCIAL
PRODUCTS, INC., as Agent

By: _____
Name: _____
Title: SENIOR VICE PRESIDENT
GREENWICH CAPITAL CORPORATE SERVICES,
AS ATTORNEY-IN-FACT

Copies to:

Blank Rome LLP
One Logan Square
Philadelphia, PA 19103
Attention: Lawrence F. Flick, II
Telecopier No.: (215) 569-5555

Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178-0002
Attention: Mark R. Somerstein
Telecopier No.: (212) 808-7897

Pryor Cashman Sherman & Flynn LLP
410 Park Avenue, 10th Floor
New York, NY 10022
Attention: Tina Niehold Moss
Telecopier No.: (212) 326-0806

United States Trustee
844 King Street
Suite 2207
Lockbox 35
Wilmington, DE 19801
Attention:      Frank J. Perch, III
                William K. Harrington
Telecopier No.: (302) 573-6497

Greenberg Traurig LLP
The Brandywine Building
1000 West Street
Suite 1540
Wilmington, DE 19801
Attention: Scott D. Cousins
Telecopier No.: (302) 661-7360

Greenberg Traurig LLP
77 West Wacker Drive
Suite 2500
Chicago, IL 60601
Attention: Nancy A. Mitchell
Telecopier No.: (312) 456-8435

3

# EXHIBIT B



# COZEN
# O'CONNOR
## ATTORNEYS

A PROFESSIONAL CORPORATION

SUITE 1400   CHASE MANHATTAN CENTRE   1201 NORTH MARKET STREET   WILMINGTON, DE 19801-1147
302.295.2000   888.207.2440   302.295.2013 FAX   www.cozen.com

**John T. Carroll, III**
Direct Phone 302.295.2028
Direct Fax    302.295.2013
jcarroll@cozen.com

**VIA E-MAIL**
**VIA REGULAR MAIL**

Bennett L. Spiegel, Esquire
Kirkland & Ellis LLP
777 South Figueroa Street
Suite 3700
Los Angeles, CA 90017

> **Re:   American Business Financial Services, Inc.**
> **Chapter 7**
> **Case No. 05-10203 (MFW)**
>
> **Subject matter:    Request to Greenwich Capital Financial Products, Inc.**
> **for Accounting of DIP Facility**

Dear Bennett:

On behalf of my client, George L. Miller, Chapter 7 Trustee (the "Trustee") for the above referenced debtors, (the "Debtors") we hereby request that your client, Greenwich Capital Financial Products, Inc. ("GCFP") as Lender and Agent provide an accounting to the Trustee of any and all (i) funds provided by GCFP to the Debtors pursuant to the debtor-in-possession financing facility of up to $500,000,000 (the "DIP Facility") approved by Order of the United States Bankruptcy Court for the District of Delaware, dated March 9, 2005 (Docket Entry 366) (the "DIP Order"), and (ii) funds received by GCFP in payment of the DIP Facility by the Debtors, or, third parties for the benefit of the Debtors.

The Trustee requests the accounting of the DIP Facility provide the following schedules, information and supporting documents:

Bennett L. Spiegel, Esquire
July 19, 2006
Page 2

---

1.    ***Schedule of Advances:***

A schedule listing each advance of funds made to the Debtors by GCFP under the DIP Facility by applicable tranche facility (A, B, C, D and E) including date, amount and banking information together with copies of wire advices, checks and/or other documents identifying/supporting receipt by the Debtors.

2.    ***Schedule of Repayment:***

A schedule listing each repayment of funds made to GCFP on the DIP Facility by applicable tranche facility (A, B, C, D and E) including date, amount and identification of source of payment together with wire advices, checks and/or other documents identifying/supporting the repayment. To the extent funds were received directly from any Trust(s), the remittance advices and any additional underlying support received from the Trust(s) should be provided. To the extent any funds in payment of the DIP Facility were received by GCFP from the sale or other disposition of property of the Debtors as collateral, a detailed accounting of any costs of disposition which were deducted from gross proceeds including supporting invoices is requested.

3.    ***Schedule of Interest Charges:***

A schedule listing all interest charges under the DIP Facility by date including calculation with a statement of unpaid principal balance and interest rate applied.

4.    ***Schedule of Expenses:***

A schedule listing all expenses charged to the DIP Facility together with (i) supporting documentation for all expenses of GCFP charged to the DIP Facility and (ii) supporting invoices for all costs of third parties charged to the DIP Facility.

5.    ***Default Calculation Schedule:***

A schedule listing all covenant calculations prepared under the DIP Facility and exchanged between GCFP and the Debtors including copies of any supporting Notice(s) of Default and written communications relating to a waiver of any covenant, defaults, or other terms of the DIP Facility.

6.    ***Schedule of Ocwen Financial Corporation Funds:***

A schedule listing all funds owing to the Debtors by Ocwen Financial Corporation ("Ocwen") which were demanded and/or received by GCFP (the "Ocwen Funds") including without limitation any prepayment penalty payments and any payments from the holdbacks of funds by Ocwen in connection with the transfer of any servicing rights by the Debtors to Ocwen. In addition, the Trustee requests copies of all written communications between GCFP and Ocwen relating to the Ocwen Funds.

Bennett L. Spiegel, Esquire
July 19, 2006
Page 3

The Trustee respectfully requests that the accounting and supporting documents as outlined above be provided by GCFP within two (2) weeks from the date of this letter.

If you have any questions, please don't hesitate in contacting me.  Thank you.

Very truly yours,

COZEN O'CONNOR

By: John T. Carroll, III

JTC/jld

# EXHIBIT C

FORM 10. PROOF OF CLAIM

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

## ORIGINAL PROOF OF CLAIM

230

| In re (Name of Debtor) **American Business Mortgage Services, Inc.** | Case Number **05-10206 (MFW)** |
|---|---|

NOTE: This form should note be used to make a claim for an administrative expense arising after the commencement for the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. 6503.

| Name of Creditor (The person or entity to whom the Debtor owes money or property) **Law Debenture Trust Company of New York, as Indenture Trustee** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|

# 18421-

Name and Address Where Notices Should be Sent:

Law Debenture Trust Company of New York
Attn: Patrick J. Healy
767 Third Avenue, 31st Floor
New York, New York 10017       Tel. (212) 750-6474
with a copy to:
Pryor Cashman Sherman & Flynn LLP
Attn: Tina Nichoil Moss, Esq.
410 Park Avenue
New York, New York 10022       Tel. (212) 326-0421

☐ Check box if you have never received any notices from the bankruptcy court in this case.
☐ Check box if the address differs from the address on the envelope sent to you by the court.

**THIS SPACE IS FOR COURT USE ONLY**

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim ☐ replaces ☐ amends    a previously filed claim, dated |
|---|---|

**1.  BASIS FOR CLAIM**
☐ Goods sold
☐ Services performed
☒ Money loaned: See attached Addendum and Exhibits.
☐ Personal injury/wrongful death
☐ Taxes
☒ Other: See attached Addendum and Exhibits.

☐ Retiree benefits as defined in 11 U.S.C. §1114(a)
☐ Wages, salaries and compensation (Fill out below)
   Your social security number _____
   Unpaid compensation for services performed from
   _____ to _____ (Enter dates)

**2.  DATE DEBT WAS INCURRED**
See attached Addendum and Exhibits.

**3.  IF COURT JUDGMENT, DATE OBTAINED**

**4.  TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:**   Not less than $57,019,180.000 plus amounts presently unliquidated.
If all or part of your claim is secured or entitled to priority, also complete item 5 or 6 below.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attached itemized statement of all interest or additional charges. See attached Addendum and Exhibits.

**5.  SECURED CLAIM**
☒ Check this box if your claim is secured by collateral (including a right of setoff). See attached Addendum and Exhibits.
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☒ Other: See attached Addendum and Exhibits.

Value of Collateral: See attached Addendum and Exhibits.

Amount of arrearage and other charges at time case filed included in secured claim, if any: See attached Addendum and Exhibits.

**6.  UNSECURED PRIORITY CLAIM**
☒ Check this box if you have an unsecured priority claim.
Amount entitled to priority   $See attached Addendum and Exhibits.
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650)*, earned not more than 90 days before filing of the bankruptcy petition or cessation of the Debtor's business, whichever is earlier – 11 U.S.C. §507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4).
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. §507(a)(7).
☒ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)(_).

* Amounts are subject to adjustment of 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

THIS SPACE IS FOR COURT USE ONLY

**7.  CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to Debtor.

**8.  SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. See attached Addendum.

**9.  DATE-STAMPED COPY:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**10.  AMENDMENTS.** Creditor reserves the right to amend or supplement this proof of claim.

| Date **August 4, 2005** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any.) By _____ Patrick J. Healy, Vice President Law Debenture Trust Company of New York |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.



**Addendum to Proof of Claim of Law Debenture Trust Company of New
York, as Indenture Trustee, under the Indenture for the Senior Collateralized
Notes dated as of December 31, 2003 against
American Business Mortgage Services, Inc. ("Debtor"); Case No. 05-10208 (MFW)**

Patrick J. Healy is a Vice President of Law Debenture Trust Company of New

York, a banking corporation and trust company organized under the laws of the State of

New York ("Claimant" or the "Indenture Trustee"). Claimant's business address is Law

Debenture Trust Company of New York, 767 Third Avenue, 31st Floor, New York, New

York 10017. Patrick J. Healy is duly authorized and empowered to file a proof of claim

on behalf of the Claimant.

1.      Claimant is the successor Indenture Trustee to U.S. Bank National

Association ("U.S. Bank") under the Indenture (the "Indenture"),[1] dated as of December

31, 2003, by and among ABFS, as obligor, and U.S. Bank, as Indenture Trustee, pursuant

to which ABFS was authorized to issue its Senior Collateralized Notes in the aggregate

principal amount of $100,000,000.00 (the "Notes").

2.      Claimant became the successor Indenture Trustee under the Indenture

pursuant to the Instrument of Resignation, Appointment and Acceptance, dated as of

February 4, 2005 (the "Tri-party Agreement"),[2] by and among ABFS, U.S. Bank, as

resigning Indenture Trustee, and Claimant, as successor Indenture Trustee.

3.      On January 21, 2005 and January 24, 2005 (collectively, the "Petition

Date"), ABFS and certain of its direct and indirect subsidiaries, as debtors and debtors-in-

possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter

---

[1] The Indenture is attached hereto as Exhibit A.
[2] The Tri-Party Agreement is attached hereto as Exhibit B.

430077

11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

4.    The holders of the Notes have claims that arose prior to the Petition Date as a result of the issuance by ABFS of the Notes and the security interests granted by the Debtor pursuant to the Orders and Collateral Documents (as defined below).

5.    As of the Petition Date, the Debtor was, and remains, indebted to Claimant as the successor Indenture Trustee pursuant to, inter alia, the Indenture and the Orders and Collateral Documents, in the following amount: $57,019,180, consisting of (a) $54,603,786 in principal amount of the Notes; and (b) $2,415,394 in accrued but unpaid pre-petition interest at the applicable rates specified in, without limitation, Sections 2.1 and 2.13 of the Indenture. Pursuant to Section 2.3 of the Indenture, ABFS serves as the Registrar and Paying Agent for the Notes. Accordingly, the amounts set forth in this Proof of Claim are based upon the records of ABFS as provided to the Indenture Trustee, and the Indenture Trustee has not independently verified the amounts claimed herein. This Proof of Claim also incorporates a claim asserted in an unliquidated amount for additional principal and/or pre-petition interest due on the Notes to the extent that it is subsequently determined by the Indenture Trustee that such additional principal and/or pre-petition interest is due and payable.

6.    The Debtor is also indebted to Claimant for interest at the rate provided by the terms of the Indenture in such amounts from the Petition Date through the date of payment of such amount as allowed by applicable law.

7.    The claims of the holders of the Notes and Claimant are secured by a lien on certain collateral (the "Collateral") pursuant to, inter alia: (1) the Security Agreement

(as amended and restated, the "Security Agreement")[3], dated December 31, 2003, and the amendments thereto, and certain UCC-1 Financing Statements (the "Financing Statements")[4]; (2) the Final Order (I) Authorizing Incurrence of Indebtedness with Administrative Super-Priority and Secured by Senior Liens and Security Interests on Substantially All Assets of Debtors Pursuant to Bankruptcy Code §§ 364(c)(1), (c)(2), (c)(3), and (d)(1), (II) Authorizing Repayment of Certain Prepetition Debt, (III) Granting Adequate Protection and Other Relief, (IV) Authorizing Certain Debtors to Consent to Transfer of Certain IOS, and (V) Authorizing Use of Cash Collateral (the "Financing Order")[5] (Dkt. No. 366) entered by the Bankruptcy Court on March 10, 2005; (3) the Order (A) Approving Sale of Advance Receivables Free and Clear of All Liens, Claims, Encumbrances, Rights of Offset, Recoupment and Other Defenses and (B) Authorizing the Assumption and Assignment of Related Servicing Rights (the "Sale Order")[6] (Dkt. No. 575) entered by the Bankruptcy Court on April 4, 2005; and (4) the Interim Order (I) Authorizing the Trustee to Operate the Debtors' Businesses for a Limited Period Pursuant to 11 U.S.C. § 721; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (III) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001, dated May 27, 2005 (the "Interim Chapter 7 Order")[7] (Dkt. No. 895)( the Security Agreement, the Financing Statements, the Financing Order, the Sale Order, and the Interim Chapter 7 Order, collectively, the "Orders and Collateral Documents").

---

[3] A copy of the Security Agreement and amendments thereto are attached hereto as Exhibit D.
[4] A copy of the Financing Statements is attached hereto as Exhibit E.
[5] A copy of the Financing Order is attached hereto as Exhibit F.
[6] A copy of the Sale Order is attached hereto as Exhibit G.
[7] A copy of the Interim Chapter 7 Order is attached hereto as Exhibit H.

430077                                    3

8.     This claim is a secured claim except to the extent that the Collateral is insufficient to satisfy the amounts claimed herein. This claim is also filed as a general unsecured claim as to any deficiency on the amounts claimed herein, and as an administrative expense claim to the extent permitted by applicable law including 11 U.S.C. § 507(b) and prior Orders of the Court.

9.     The Debtor is also indebted to Claimant in an amount presently unliquidated for Claimant's fees and expenses, including reasonable fees and disbursements of counsel and other agents, in accordance with Section 7.7 of the Indenture. This amount constitutes an administrative expense claim within the purview of 11 U.S.C. §§ 503 and 507 and Section 7.7 of the Indenture, and a secured claim as provided in Section 7.7 of the Indenture. Claimant hereby reserves the right to amend this Proof of Claim, for among other purposes, to include fees and expenses, including the reasonable fees of counsel and other agents, incurred by Claimant. The Debtor is also obligated to Claimant in an unliquidated amount for the costs and expenses of Claimant defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties under the Indenture. This constitutes notice of Claimant's intent to seek administrative or secured treatment of the amount due Claimant.

10.     This claim is based upon, without limitation, the provisions of the Indenture and the Orders and Collateral Documents. The consideration for this claim consists of, inter alia, amounts lent to ABFS by the holders of the Notes upon the date of original issuance and exchange thereof and the services of the Indenture Trustee.

11.     Failure to comply with the requirements of the Indenture includes the default in payment of interest due prior to the Petition Date and the filing by ABFS of a

430077                                    4

petition seeking relief under Chapter 11 of the Bankruptcy Code.  See Section 6.1 of the Indenture.

12.     Pursuant to Section 6.9 of the Indenture, Claimant is expressly authorized to file this Proof of Claim on behalf of the holders of the Notes.

13.     No part of the aforesaid claim has been paid and the Claimant holds no cash under the Indenture for the aforesaid claim. No judgment has been rendered on this claim.

14.     This claim is not subject to any set off or counterclaim.

15.     Pursuant to Section 7.7 of the Indenture, Claimant has a contractual charging lien on all distributions made on account of this claim.  Thus Claimant hereby demands that any distributions on account of this claim be made through Claimant pursuant to Section 6.9 of the Indenture and Fed. R. Bankr. P. 3021 so that Claimant can assert its lien rights.

16.     The Claimant, on behalf of itself and each holder of the Notes, expressly reserves: (i) its and their rights and claims against the Debtor and against any division, subsidiary or affiliate thereof and their respective creditors, agents, representatives, and professionals under 11 U.S.C. § 510, including claims of subrogation, equitable subordination, and the right and benefit at law or in equity to all rights and interests under and with respect to the Indenture; (ii) its and their rights and remedies under the Trust Indenture Act of 1939 and other applicable federal and state law against the Debtor, and against any division, subsidiary or affiliate thereof and their respective present and former creditors, agents, representatives, officers and directors, shareholders and professionals for, inter alia, breach of fiduciary duty, securities law violations, lien and transfer

430077                              5

avoidance, fraud, constructive trust, equitable lien or other legal or equitable remedies to which it or they may be entitled; (iii) its and their rights to seek to consolidate the Debtor and any and all affiliates and/or to impose a constructive trust or equitable lien on assets of the Debtor and/or any of its affiliates; and (iv) for rescission of the purchase of the Notes and related remedies.

17.    This Proof of Claim is filed under compulsion of the bar date that has been set in this case. Claimant expressly reserves all rights accruing to it as Indenture Trustee, and the filing of this Proof of Claim is not intended to be and shall not be construed as: (i) an election of remedy; (ii) an act of acceleration; (iii) waiver of any past, present or future event of default; or (iv) a waiver or limitation of any rights of Claimant or the holders of the Notes.

18.    Claimant expressly reserves the right to amend or supplement this Proof of Claim if Claimant should deem it necessary and appropriate for any reason, including without limitation, to provide an updated statement of amount then due, or for any other purpose for which a Proof of Claim filed in this case may be amended.

19.    Filing of this Proof of Claim is not: (i) a waiver or release of Claimant's or the holders of the Notes' rights against any person, entity, or property; (ii) a consent by Claimant or the holders of the Notes to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim, any objections or other proceedings commenced with respect thereto, or any other proceedings commenced in this case or otherwise involving the Claimant or the holders of the Notes; or (iii) a waiver of the right to move to withdraw the reference, or otherwise to challenge the jurisdiction of the Bankruptcy Court with respect to the subject matter of this claim, any objection or other

430077                                6

proceedings commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving Claimant or the holders of the Notes.

20.    All notices to the Claimant should be sent to:

Patrick J. Healy
Vice President
Law Debenture Trust Company of New York
767 Third Avenue, 31st Floor
New York, New York 10017
Tel: (212) 750-6474
Fax: (212) 750-1361

with a copy to:

Tina Nichold Moss, Esq.
Pryor Cashman Sherman & Flynn LLP
410 Park Avenue
New York, New York 10022
Tel: (212) 326-0421
Fax: (212) 326-0806

## EXHIBITS A-H

**DUE TO THE VOLUMINOUS NATURE OF EXHIBITS A-H,
EXHIBITS A-H ARE SUMMARIZED IN THIS PROOF OF CLAIM.
COPIES CAN BE OBTAINED UPON REQUEST TO:**

Pryor Cashman Sherman & Flynn LLP
410 Park Avenue
New York, New York 10022
Fax: (212) 326-0806
Attn: Dallas L. Albaugh, Esq.

430086

# EXHIBIT D

2/8

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
|---|---|

In re (Name of Debtor)
**American Business Financial Services, Inc.**

Case Number:
**05-10203 (MFW)**

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
*(The person or entity to whom the debtor owes money or property)*

**WELLS FARGO BANK, NATIONAL ASSOCIATION, as Indenture Trustee**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

**# 19730**

Name and Addresses Where Notices Should be Sent

Wells Fargo Bank,
National Association
Sixth and Marquette
MAC N9303-120
Minneapolis, MN 55479
Attn: Julie J. Becker, Vice President
Fax: (612) 667-9825

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: David E. Retter, Esq.
Mark R. Somerstein, Esq.
Fax: (212) 808-7897

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:
Indenture, dated as of June 30, 2004, pursuant to which $41,000,000 in aggregate principal amount of American Business Financial Services, Inc.'s Senior Collateralized Notes remains outstanding. (See Attachment.)

Check here if this claim:
☐ replaces
☐ amends

| 1. BASIS FOR CLAIM: | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
| ☐ Services performed | ☐ Wages, salaries, and compensations (Fill out below) |
| ☐ Money loaned | Your social security number _____ |
| ☐ Personal injury/wrongful death | Unpaid compensations for services performed |
| ☐ Taxes | From _____ to _____ |
| ☒ Other (Describe briefly) (See Attachment.) | (date)        (date) |

| 2. DATE DEBT WAS INCURRED: June 30, 2004 and thereafter | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

4. CLASSIFICATION OF CLAIM. Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another.
CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM.

☒ SECURED CLAIM
Attach evidence of perfection of security interest.
Brief Description of Collateral: see attachment

☐ Real Estate    ☐ Motor Vehicle    ☒ Other (Describe briefly)
Amount of arrearage and other charges included in secured claim above, if any $ _____

☐ UNSECURED NONPRIORITY CLAIM $ _____
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM $ _____
Specify the priority of the claim.
☐ Wages, salaries, or commissions (up to $4,300), earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan—U.S.C. § 507(a)(4)
☐ Up to $1,950 of deposits toward purchase, lease, or rental of property or services of personal, family, or household use—11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)
☐ Other—11 U.S.C. §§ 507(a)

| 5. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED: | $ _____ (Unsecured) | $ 41,130,505.00* (Secured) | $ _____ (Priority) | $ 41,130,505.00* (Total) |
|---|---|---|---|---|

*Plus interest and any and all other amounts due under the Indenture and the Notes. (See Attachment.)
☐ Check this box if claim includes prepetition charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

6. CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

THIS SPACE IS FOR COURT USE ONLY

**FILED**
US BANKRUPTCY COURT
DISTRICT OF DELAWARE
2005 AUG 10 AM 10: 6_

7. SUPPORTING DOCUMENTS: Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

| Date August 5, 2005 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) Julie J. Becker, Vice President |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

### ATTACHMENT TO PROOF OF CLAIM OF WELLS FARGO
### BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE

1.    BASIS FOR CLAIM

WELLS FARGO BANK, NATIONAL ASSOCIATION ("Wells Fargo") is the

successor Indenture Trustee under the Indenture, dated as of June 30, 2004, (the "Indenture"),

between American Business Financial Services, Inc. (the "Company"), as Issuer, and U.S. Bank

National Association, as predecessor Indenture Trustee (the "Predecessor Trustee" and together

with Wells Fargo, the "Indenture Trustees"), pursuant to which $60,000,000.00 aggregate

principal amount of certain Senior Collateralized Notes (the "Notes") were issued, and of which

$41,130,505.00 aggregate principal amount remains outstanding as of December 31, 2004.

Pursuant to the Security Agreement, dated as of June 30, 2004, as amended and restated

(collectively, the "Security Agreement"), by among the Predecessor Trustee and ABFS

Consolidated Holdings, Inc., American Business Mortgage Services, Inc., HomeAmerican

Credit, Inc., and American Business Credit, Inc. (collectively, the "Grantors"), the Grantors

pledged certain assets to secure the Company's obligations and undertakings under the Notes and

the Indenture.  The assets securing the Company's obligations are set forth in detail in the

Security Agreement and certain UCC-1 Financing Statments.  The extent of the assets securing

the Company's obligations under the Notes and the Indenture, and the priority of such security

interests, may have been modified, in whole, or in part, by: (a) the Final Order (i) Authorizing

Incurrence of Indebtedness with Administrative Super-Priority and Secured by Senior Liens and

Security Interests on Substantially All Assets of Debtors Pursuant to Bankruptcy Code §§

364(c)(1), (c)(2), (c)(3), and (d)(1), (ii) Authorizing Repayment of Certain Prepetition Debt,

(iii) Granting Adequate Protection and Other Relief, (iv) Authorizing Certain Debtors to Consent

to Transfer of Certain IOS, and (v) Authorizing Use of Cash Collateral (the "Final DIP Order")(Docket. No. 366), dated March 9, 2005; (b) Order (A) Approving Sale of Advance Receivables Free and Clear of All Liens, Claims, Encumbrances, Rights of Offset, Recoupment and Other Defenses and (B) Authorizing the Assumption and Assignment of Related Servicing Rights (the "Servicing Sale Order")(Docket No. 575), dated April 4, 2005; and (c) the Interim Order (I) Authorizing the Trustee to Operate the Debtors' Businesses for a Limited Period Pursuant to 11 U.S.C. § 721; (II) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (III) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001, dated May 27, 2005 (the "Interim Chapter 7 Order") (Dkt. No. 895) (the "Cash Collateral Order"). Copies of the Indenture, the Security Agreement, UCC-1 Financing Statements, the Final DIP Order, the Servicing Sale Order, and the Cash Collateral Order are annexed hereto as Exhibit A, and all provisions of the Notes, the Indenture, the Security Agreement, the Final DIP Order, the Servicing Sale Order, and the Cash Collateral Order are each expressly incorporated herein by reference.

      2.      TOTAL AMOUNT OF CLAIM:

      On January 21, 2005, and January 24, 2005 (together, the "Petition Dates"), the Company and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Company was, and still is, indebted to Wells Fargo in the following amounts:

(a)     Principal Amount:  $41,130,505.00 (as of the Petition Dates)

(b)     Interest:

      (i)     $2,688,024.00 accrued unpaid interest through the Petition Dates; plus

      (ii)    postpetition interest, interest on overdue principal and interest on overdue installments of interest, to the extent permitted by law, at the rate borne by the Notes.

(c)     Trustee Expenses through June 30, 2005:  not less than $1,627,097.62.

The Company is obligated to the Indenture Trustees for all amounts due and to become due to the Indenture Trustees for their reasonable compensation and for all reasonable disbursements, expenses and advances incurred or made by the Indenture Trustees (including the reasonable disbursements, compensation and expenses of each of the Indenture Trustees' agents and counsel) under Section 7.7 of the Indenture (the "Trustee Expenses"), and for all other amounts, including, without limitation, indemnification obligations, due or to become due to the Indenture Trustees under Section 7.7 of the Indenture.

(d)     Other Unliquidated Amounts:

The Company is obligated to Wells Fargo for any and all other amounts due or to become due under the Indenture, whether now due or hereafter arising, which amounts may, presently, be unliquidated or contingent, but may become fixed and liquidated in the future, including, without limitation, amounts owed as or for interest, including interest commencing on the Interest Accrual Date at a rate which is 10 basis points in excess of the interest rate paid by the Company to the Holders of the Notes, default interest, and to the extent lawful, any interest payable on the default interest, post-petition interest in any bankruptcy proceeding on overdue

installments of interest at the same rate (compounded annually), redemption of the Notes,

including redemption by the estate of a Holder upon the Holder's death, redemption price,

premiums, expenses, indemnities, compensatory, secondary and/or punitive damages, costs of

collection, compensation and reimbursement, which are to be treated as administrative expenses

in the Company's chapter 11 bankruptcy cases, the Company's obligation to pay taxes and cause

each of its direct and indirect subsidiaries to pay taxes, and accelerated payment of unpaid

principal and accrued interest upon the occurrence of certain defaults, as set forth in the

Indenture.

        3.    INQUIRY NOTICE

This Proof of Claim serves, and is intended to serve, as notice of a claim for

any amount due or to become due under the Notes and the Indenture, the provisions of which

are expressly incorporated herein by reference, whether or not summarized or identified

specifically in this Proof of Claim, and all interested parties are on notice of, and advised to

examine the provisions of the Notes and the Indenture.  In addition, because the Debtors

served as Paying Agent and Disbursing Agent with respect to the Indenture, the amount of

principal and unpaid interest is dependent on the accuracy of the Debtors' book and records.

The Trustee has reviewed and analyzed the Debtors' books and records in connection with

the preparation of this Proof of Claim; however, the Trustee cannot independently verify the

accuracy of the Debtors' book and records.  As such, to the extent discrepancies in the

Debtors' books and records are discovered, the Trustee should be permitted to freely amend

this Proof of Claim.

4.   RESERVATION OF RIGHTS

Wells Fargo does not waive, and expressly reserves, all rights and remedies at law or in equity that Wells Fargo, individually or as Indenture Trustee (including the Predecessor Trustee), has or may have against the Debtors and/or any of the Debtors' affiliates and subsidiaries, or any other person or entity, including, without limitation, rights against the Holders. Wells Fargo reserves the right to amend or supplement this claim at any time and in any respect, including, without limitation, as necessary or appropriate to amend, quantify or correct amounts, to provide additional detail regarding the claims set forth herein, or to fix the amount of any contingent or unliquidated claim.

5.   JURISDICTION

In filing the within claim, Wells Fargo does not submit itself to the jurisdiction of this Court for any purpose other than with respect to the allowance of this claim for any and all amounts due under the Indenture, and does not consent to the jurisdiction of this Court to adjudicate any other matter relating to the Indenture or the rights and remedies of the Indenture Trustees and/or the Holders, including, without limitation, any adjudication concerning the charging lien and other lien rights granted to the Indenture Trustees, and/or priority in payment accorded to the Indenture Trustees pursuant to the Indenture and related documents in connection with the issuance of the Notes described herein.

## <u>EXHIBIT A</u>

*[DUE TO THE VOLUMINOUS NATURE OF THE DOCUMENTS;
COPIES OF EACH OF THE DOCUMENTS CAN BE OBTAINED FROM
COUNSEL TO WELLS FARGO BANK, NATIONAL ASSOCIATION,
BY CONTACTING EDWARD LEEN, IN WRITING, VIA FAX AT
212-808-7897, OR VIA E-MAIL AT ELEEN@KELLEYDRYE.COM]*