**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| AMERICAN BUSINESS FINANCIAL | ) | Case No. 05-10203 (MFW) |
| SERVICES, INC., et al., | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ──────────────────────── | ) | |
| | ) | |
| GEORGE L. MILLER, TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 06-50826 (MFW) |
| | ) | |
| GREENWICH CAPITAL FINANCIAL | ) | |
| PRODUCTS, INC., OCWEN LOAN | ) | |
| SERVICING, LLC, WELLS FARGO | ) | |
| BANK, N.A., LAW DEBENTURE | ) | |
| TRUST COMPANY OF NEW YORK, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| ──────────────────────── | ) | |

**OPINION**[1]

Before the Court are motions for summary judgment filed by
Defendant, Greenwich Capital Financial Products, Inc.
("Greenwich"), on the Trustee's Amended Complaint.[2]  Two of
Greenwich's Motions seek judgment based on releases given by the
Trustee and the Debtors, which the Trustee alleges are invalid

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

[2]  The Trustee has also filed a motion for partial summary
judgment on one of Greenwich's counterclaims, contending that the
Court does not have jurisdiction to hear that claim.  The Court
finds it unnecessary to address the Trustee's motion in order to
rule on Greenwich's motions.

because Greenwich committed a fraud on the court or common law fraud in obtaining them.  Greenwich's other motions seek summary judgment on the remaining counts of the Trustee's Amended Complaint.  For the reasons set forth below, the Court finds that Greenwich did not commit any fraud and, consequently, will uphold the validity of the releases and grant summary judgment in favor of Greenwich on all counts of the Amended Complaint that relate to actions taken before the releases were given.  The Court further finds that summary judgment in favor of Greenwich is warranted on the remaining counts of the Trustee's Amended Complaint.

I.   <u>BACKGROUND</u>

American Business Financial Services, Inc., and its subsidiaries (collectively, the "Debtors") operated as a financial services organization that originated and serviced mortgage loans primarily to credit-impaired borrowers.  The Debtors raised capital by selling pools of these loans to special purpose entities created for securitization purposes (the "SPEs").  The SPEs then sold the pools of loans to mortgage loan trusts (the "Trusts").  To raise cash to purchase the loans, the Trusts sold notes or trust certificates secured by the Trusts' assets to investors.

In exchange for the loans sold to the SPEs, the Debtors received cash and certificates of beneficial interests in the Trusts that entitled them to receive certain cash flows generated by the Trusts after investors were repaid (the "I/O Strips"). The Debtors also retained the right to service the loans for a fee.

On January 21, 2005, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors filed a motion seeking debtor-in-possession financing, pursuant to which Greenwich agreed to provide the Debtors with a senior, secured, super-priority $500 million credit facility (the "DIP Loan"). (App. 4.)[3] The DIP Loan was secured by substantially all of the Debtors' assets, including the I/O Strips which had a reported book value of $391 million. (Id. at § 4.01.) On March 9, 2005, the Court entered the Final DIP Order. (Ex. W.)

_____

[3] Citations to the record are as follows: citations to pleadings filed in the bankruptcy case shall be "D.I. #"; citations to pleadings filed in the adversary case shall be "Adv. D.I. #"; citations to the Amended Complaint shall be "Am. Cm."; declarations submitted in connection with the motions for summary judgment shall be referenced as "Decl. of [ ] at ¶ #"; citations to exhibits submitted by the parties through declarations of their attorneys shall be cited as follows: "Ex. A" through "Ex. BBB" and "Ex. C-1" through "Ex. C-120" shall refer, respectively, to the exhibits submitted under Mr. Horowitz's and Mr. Coren's declarations in connection with the motions for summary judgment on the fraud on the court and common law fraud counts; "Ex. H-1" through "Ex. H-96" and "App. 1" through "App. 72" shall refer, respectively, to the exhibits submitted under Mr. Horowitz's and Mr. Coren's declarations in connection with the motions for summary judgment on the remaining counts.

Shortly thereafter, on April 4, 2005, the Court approved the sale of the Debtors' servicing rights to Ocwen Loan Servicing, LLC ("Ocwen") for net recovery to the estate of approximately $21 million.  (D.I. 575.)  On that same day, the Debtors publicly announced that a reorganization was not possible and that they intended to file a liquidating plan.  (App. 17.)  On May 13, 2006, Greenwich declared a default on the DIP Loan.  (Ex. T.)

As a result, the bankruptcy case was converted to chapter 7 and George L. Miller was appointed trustee (the "Trustee").  The Trustee and Greenwich subsequently entered into an agreement dated July 20, 2005 (the "Consent Agreement") whereby the Trustee agreed to conduct a sale pursuant to section 363 of the Bankruptcy Code of certain of Greenwich's collateral (the whole loan assets of the Debtors).  (Ex. C-113.)  The Court approved the Consent Agreement on August 19, 2005, at the same time it approved the sale of the whole loans to Credit-Based Asset Servicing and Securitization, LLC, for approximately $29 million.  (Ex. C-80.)  Under the Consent Agreement, the Trustee received $300,000 of the sale proceeds for the benefit of the Debtors' estates and released Greenwich from any and all claims.  (Ex. C-113 at ¶¶ 2 & 3; Ex. C-80 at ¶ 4.)  Greenwich subsequently foreclosed on other collateral (some of the I/O Strips) which it sold to Ocwen for $5.1 million in June 2006 by public auction pursuant to Article 9 of the Uniform Commercial Code.

4

On September 13, 2006, the Trustee filed a Complaint against
Greenwich, Ocwen, the Indenture Trustees for the collateralized
noteholders (the "ITs"), and others.[4]  The Trustee asserted the
following claims against Greenwich: (1) turnover, (2) avoidance
of fraudulent transfers under the Bankruptcy Code and state law,
(3) request for accounting, (4) breach of fiduciary duty, (5)
aiding and abetting a breach of fiduciary duty, (6) breach of
contract, (7) fraud on the court, (8) common law fraud, (9) civil
conspiracy, (10) conversion, (11) objections to and subordination
of Greenwich's claims, and (12) declaratory relief.

Greenwich filed a motion to dismiss, which was granted in
part by the Court, with leave to amend the Complaint with respect
to all counts except the turnover count which was dismissed with
prejudice.  Miller v. Greenwich Capital Fin. Prods., Inc., et al.
(In re Am. Bus. Fin. Servs., Inc.), 361 B.R. 747, 764-65 (Bankr.
D. Del. 2007).  The Trustee filed an Amended Complaint and
Greenwich filed a second motion to dismiss certain counts, which
was denied.  Miller v. Greenwich Capital Fin. Prods., Inc., et
al. (In re Am. Bus. Fin. Servs., Inc.), 384 B.R. 80, 94 (Bankr.
D. Del. 2008).

---

[4]  The Court subsequently granted motions for summary
judgment in favor of two of the other defendants.  Miller v.
Greenwich Capital Fin. Prods., Inc., et al. (In re Am. Bus. Fin.
Servs., Inc.), 457 B.R. 314 (Bankr. D. Del. 2011).

On October 24, 2008, Greenwich filed two motions for partial summary judgment on the fraud on the court and common law fraud counts.  On August 13, 2009, Greenwich filed two motions for summary judgment on the remaining counts of the Amended Complaint.  The Trustee opposed the motions.  Briefing on the motions is complete, and the matter is ripe for decision.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this adversary proceeding.  28 U.S.C. §§ 1334(b) & 157(b)(1).  Many of the counts are core and the parties have raised no objection to the Court rendering a final judgment in this proceeding on all counts.  28 U.S.C. § 157(b)(2)(A), (B), (E), (H), & (O).

A.  <u>Effect of Stern v. Marshall</u>

In <u>Stern v. Marshall</u>, however, the Supreme Court ruled that bankruptcy courts lack the constitutional authority to decide matters relating to state law counterclaims.  131 S. Ct. 2594, 2620 (2011).  The Supreme Court held that the bankruptcy court's power depends on "whether the action at issue stems from the bankruptcy itself."  <u>Id.</u> at 2618.  In this case, the claims asserted by the Trustee (although based in part on state law) relate to the conduct of the parties during this bankruptcy case. Therefore, the Court concludes that it has the constitutional authority to enter a final judgment on all claims because they

"relate entirely to matters integral to the bankruptcy case."
<u>Am. Bus. Fin. Servs.</u>, 457 B.R. at 319.  <u>See also</u> <u>In re Salander</u>
<u>O'Reilly Galleries</u>, 453 B.R. 106, 117 (Bankr. S.D.N.Y. 2011)
("Nowhere in . . . <u>Stern</u> does the Supreme Court rule that the
bankruptcy court may not rule with respect to state law . . .
when deciding a matter directly and conclusively related to the
bankruptcy.").

 B. <u>Jurisdiction over Greenwich's Counterclaim</u>

 In its fifth counterclaim to the Trustee's Amended
Complaint, Greenwich seeks a declaratory judgment that the I/O
Strips are owned by the Debtor's estate or Trustee "for all
purposes, including tax purposes."  (Adv. D.I. 345 at ¶ 70.) The
Trustee contends in a motion for partial summary judgment on this
counterclaim that the Court lacks jurisdiction to grant that
relief.  28 U.S.C. § 2201(a) (allowing federal courts to grant
declaratory relief "except with respect to Federal taxes").
Greenwich responds that it is not seeking a declaratory judgment
that the Trustee owned the I/O Strips for a determination of who
is responsible for federal taxes but only with respect to whether
Greenwich was reasonable in how it dealt with the I/O Strips.

 The Court finds it unnecessary to decide Greenwich's fifth
counterclaim in order to rule on the merits of its defenses to
the Trustee's Amended Complaint and, therefore, need not decide
at this time whether it has jurisdiction over that counterclaim.

III.  DISCUSSION

    A.   Standard of Review

The Court should grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[5]

In considering a motion for summary judgment under Rule 56, the Court must view the inferences from the record in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hollinger v. Wagner Mining Equip. Co., 667 F.2d 402, 405 (3d Cir. 1981).  If there does not appear to be a genuine issue as to any material fact and on such facts the movant is entitled to judgment as a matter of law, however, the Court must enter judgment in the movant's favor.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 413 (3d Cir. 1990).

The movant bears the burden of establishing that no genuine issue of material fact exists.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986); Integrated Water Res., Inc. v. Shaw Envtl., Inc. (In re IT Grp.,

---

[5]  Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings.

Inc.), 377 B.R. 471, 475 (Bankr. D. Del. 2007).  A fact is
material when it could "affect the outcome of the suit."
Anderson, 477 U.S. at 248.

Once the moving party has established its prima facie case,
the party opposing summary judgment must go beyond the pleadings
and point to specific facts showing there is a genuine issue of
fact for trial.  See, e.g., id. at 252; Matsushita, 475 U.S. at
585-86; Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir. 2000);
Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d
160, 164 (3d Cir. 1999).  If the moving party offers only
speculation and conclusory allegations in support of its motion,
its burden of proof is not satisfied.  See Ridgewood Bd. of Educ.
v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).

After review of the more than three hundred exhibits
containing, inter alia, hundreds of pages of deposition
testimony, the Court concludes that there are no disputes of
material fact relevant to Greenwich's motions for summary
judgment and that Greenwich has established it is entitled to
judgment in its favor.

    B.   Fraud on the Court

In its motion for summary judgment, Greenwich contends that
the Trustee does not provide sufficient evidence to meet the
"demanding standard" established by the Third Circuit to
establish a fraud on the court claim.  Herring v. United States,

9

424 F.3d 384, 389 (3d Cir. 2005) ("[F]raud on the court must
constitute 'egregious misconduct . . . such as bribery of a judge
or jury or fabrication of evidence by counsel.'").  The Trustee
disagrees, contending that his Amended Complaint alleges three
specific misrepresentations made by Greenwich and its attorneys
directed to the Court with the intention of deceiving it: (1) the
value of the I/O Strips that were pledged to Greenwich under the
DIP Loan, (2) that the Debtors were in compliance with the
covenants of the DIP financing agreement at the time the Final
DIP Order was entered, and (3) that Greenwich would in fact lend
the Debtors $500 million under the DIP financing agreement.

The Trustee must meet a high legal standard to establish
fraud on the court.  "Only a small number of those acts that can
be considered fraud amount to 'fraud upon the court,' as that
phrase is used in Rule 60." Kerwit Med. Prods., Inc. v. N. & H.
Instruments, Inc., 616 F.2d 833, 836-37 (5th Cir. 1980). See
also Herring, 424 F.3d at 389 (giving examples of bribery of the
judge or jury); Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118
(1st Cir. 1989) ("A 'fraud on the court' occurs where it can be
demonstrated, clearly and convincingly, that a party has
sentiently set in motion some unconscionable scheme calculated to
interfere with the judicial system's ability impartially to
adjudicate a matter . . . .").  To prove this cause of action the
Trustee must establish by "clear, unequivocal and convincing

10

evidence" the following: "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself; and (4) that in fact deceives the court." Herring, 424 F.3d at 386-87.

### 1. Officer of the Court

As an initial matter, Greenwich argues that there is no evidence that any misrepresentations were made by its attorneys and that, at most, the Trustee is asserting that Greenwich was aware of facts that it did not reveal to the Court. The Trustee responds that, under Delaware law, knowledge of a client may be imputed to its attorney. Reagan v. Randell, 2002 WL 1402233, *4 (Del. Ch. June 21, 2002) (finding fraud on the court where client knew document offered by his attorney was false).

The Court notes that it was Greenwich's attorneys who were responsible for presenting Greenwich's position to the Court. In fact, at no relevant time did any representative of Greenwich present any testimony or make any representation except through counsel. Therefore, the Court concludes that this element is met.

### 2. Directed to the Court

Greenwich cautions that fraud on the court deals only with actual representations to the Court and therefore the Trustee cannot rely on statements made by Greenwich to other parties, unless they were presented to the Court and the Court relied upon

them.  The Trustee contends that the Amended Complaint does identify three misrepresentations directed to the Court on which it relied.

### 3.  Alleged Misrepresentations

#### a.  Value of the I/O Strips

The Trustee argues that Greenwich committed a fraud on the court by knowingly misrepresenting the value of the I/O Strips in connection with approval of the DIP financing.  The Trustee contends that Greenwich valued the I/O Strips at only $91 million but stood silent while the Debtors represented to the Court that their value was nearly $400 million.  (Ex. C-26; Ex. C-37 at 26-289.)  This is significant, the Trustee contends, because the DIP was a priming loan and therefore the Court had to find that the collateralized noteholders (who were owed more than $97 million) were adequately protected by the value of the I/O Strips.  (Ex. C-49 at 47-48; Ex. C-37 at 29.)

Greenwich argues that the Trustee's claim must fail as an initial matter because Greenwich had no duty to disclose what it felt was the value of the I/O Strips.  See, e.g., Smith v. Am. Nat'l Bank & Trust Co., 982 F.2d 936, 944 (6th Cir. 1992) (holding that a "lending institution has no duty to disclose based on its role as lender" and that mere knowledge of "a customer's weak financial situation 'amounts neither to a duty to disclose this information nor to knowledge of fraud'" (quoting

12

Schneberger v. Wheeler, 859 F.2d 1477, 1480-81 (11th Cir. 1988))); Kerwit Med. Prods., 616 F.2d at 837 (finding that litigants were not obligated to tell the opposing side or the court facts that would have defeated their own claim).

The Trustee responds that Greenwich was obligated to disclose to the Court the true value of the I/O Strips especially in light of the importance of the DIP Loan.  He argues that because of the critical role that the Court plays in a bankruptcy case, it must be able to rely on all the parties to provide honest and full financial information concerning debtors appearing before it.  See, e.g., In re Bernard Techs., Inc., 342 B.R. 174, 181 (Bankr. D. Del. 2006) (denying compensation to officer of debtor where debtor failed to disclose its assets, liabilities, and revenues resulting in conversion of the case). The Trustee further argues that under Delaware law, fraud may be found not only where there are affirmative misstatements, but may "also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."  Stephenson v. Capano Dev., 462 A.2d 1069, 1074 (Del. 1983).

The cases cited by the Trustee are inapposite.  Stephenson dealt with common law fraud, not a fraud on the court, and Bernard Technologies dealt with the duty of a debtor in bankruptcy to disclose all its assets and liabilities in schedules and other filings with the court.  The Debtors in this

13

case clearly had a duty to disclose full information about their assets and liabilities.  See, e.g., Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) ("The Code imposes on debtors an affirmative duty of full disclosure.") (emphasis added); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 417 (3d Cir. 1988) ("A long-standing tenet of bankruptcy law requires one seeking benefits under its terms to satisfy a companion duty to schedule, for the benefit of creditors, all his interests and property rights.").  There is not a similar duty imposed on creditors or lenders to disclose negative information about their debtor.  See, e.g., Smith, 982 F.2d at 944 (finding that mere knowledge of customer's shaky financial condition did not create duty to disclose it to others nor create liability for aiding and abetting fraud); Schneberger, 859 F.2d at 1480-81 (same).

Further, non-disclosure is not sufficient to sustain a fraud on the court claim.  See, e.g., Shaw v. AAA Eng'g & Drafting, Inc., 138 F. App'x 62, 72 (10th Cir. 2005) (holding as a matter of law that failure to disclose does not rise to the level of egregious conduct necessary for a fraud on the court claim); Wilson v. Johns-Manville Sales Corp., 873 F.2d 869, 872 (5th Cir. 1989) (denying motion to vacate judgment because "mere non-disclosure to an adverse party and to the court of facts pertinent to a controversy before the court does not add up to

14

'fraud on the court'" (quoting <u>Kerwit Med. Prods.</u>, 616 F.2d at 837)).  Thus, the Court agrees with Greenwich that there can be no fraud on the court claim unless Greenwich made an affirmative misrepresentation to the Court about the value of the collateral that it was receiving for the DIP Loan.

Greenwich argues, however, that any statement about the value of the I/O Strips that it may have made would not be actionable because it would be a statement of opinion, not of fact, particularly given the difficulty in determining the value of those assets which depends on future compliance/default on home mortgages.  <u>See, e.g.</u>, <u>In re Pascucci</u>, 90 B.R. 438, 444 (Bankr. C.D. Cal. 1988) (holding that "representation of the value of property is a statement of opinion, that does not support a . . . claim based on fraud.").

The Trustee argues that an opinion of value is actionable where the party stating the opinion has a special expertise.  <u>See, e.g.</u>, <u>Gordon v. Butler</u>, 105 U.S. 553, 558 (1881).  In this case, the Trustee contends that Greenwich held itself out as an expert in this field, including in evaluating the I/O Strips. (D.I. 286 at ¶ 41.)

The Court disagrees with the Trustee.  Greenwich was not offered as an expert in this case.  The Court was fully cognizant of the role Greenwich was serving, as potential DIP lender.  The Court would not have placed any special reliance on Greenwich's

15

valuation of the I/O Strips, even if Greenwich had made an affirmative representation of their value.[6]

Greenwich also asserts that there is absolutely no evidence (despite the lengthy discovery undertaken by the Trustee in this adversary) that Greenwich made any misrepresentations to the Court at all with respect to the value of the I/O Strips.  It notes that it made no affirmative statements to the Court and presented no evidence in support of the DIP Loan; instead, it was the Debtors and their counsel who made the representations and presented evidence about the value of the I/O Strips in seeking approval of the DIP Loan.  (D.I. 134 at 84-85; Ex. W at 17; App. 4 at § 10.03; D.I. 423 at 21, 88-89.)  Counsel for the Debtors did not take direction from, nor consult with, Greenwich about what testimony they were going to present in support of the Motion.  (Ex. OO at 13; Ex. H-75 at 85-86.)  In addition, Greenwich notes that the representations made by the Debtors were about the book value of those assets, not about their market value.  (D.I. 134 at 25, 84-85, 109-10.)

Further, Greenwich notes that even though it did not have a duty to disclose its opinion about the value of the I/O Strips, that information was, in fact, disclosed by it to the Debtors,

_____

[6] The Trustee himself did not rely on Greenwich's representation of the value of the I/O Strips either, insisting instead that he be authorized to hire his own valuation expert. (Ex. A at 22; Ex. FF at 409, 811; Ex. C-85 at 184, 221-22; Ex. H-24.)  See discussion at Part C1, infra.

the Court, and the other parties in interest in connection with
the DIP Loan.  The full terms of the DIP Loan, including
Greenwich's borrowing base, were disclosed in the DIP Financing
Motion and its attachments.  (Ex. YY at 26; Ex. C-9 at 26; D.I.
24 at 19-26 & Ex. A at 1-9.)  That revealed that Greenwich
assigned a $55 million borrowing base limit on the I/O Strips,
based on a 60% collateral percentage; a simple mathematical
calculation would reveal, therefore, that Greenwich valued the
I/O Strips at approximately $91 million.  (D.I. 24 at 20-21, 24 &
Ex. A at 2, 5-6.)  The Debtors were fully aware of the value
placed by Greenwich on the I/O Strips as revealed in its advance
rate.  (App. 13 at 108; App. 20 at 134; Ex. OO at 301-03; Ex. C-
12 at 132-35; Ex. C-47 at 66; Ex. H-67 at 299-302; Ex. H-85 at
39-41, 66.)  The Trustee contends, nonetheless, that Greenwich
had a duty to advise the Court that the Debtors' evidence that
the I/O Strips were worth $400 million was false.

The Court disagrees.  Greenwich offered no evidence and made
no affirmative statements about the value of the I/O Strips at
all, though it did reveal the value it was attributing to them
for purposes of the DIP Loan.  (D.I. 134 at 84-85; Ex. W at 17;
App. 4 at § 10.03; D.I. 423 at 21, 88-89; Ex. YY at 26; Ex. C-9
at 26; D.I. 24 at 19-26 & Ex. A at 1-9.)  The evidence also
demonstrates that Greenwich had no involvement in what the
Debtors presented at the hearings on the DIP financing.  (Ex. H-

17

74 at 101; Ex. YY at 85-89; Ex. OO at 13.)   Further, it was clear
to the Court that the testimony presented by the Debtors was the
book value of the collateral; there were numerous objecting
parties who highlighted that issue.  (Ex. H-67 at 304-06; Ex. C-
37 at 21-29; Ex. C-46 at 340; Ex. C-47 at 103, 105; Ex. C-48 at
25, 84-87, 109; D.I. 174; D.I. 99.)  Finally, because the Final
DIP Order was submitted consensually, the Court was not asked to
decide the value of the collateral.  (Ex. OO at 307-08, 331-32.)
Therefore, the Court concludes that the Trustee has not
established this element of its fraud on the court claim.

      b.   <u>Debtors' ability to operate</u>

         i.   <u>Collateral coverage ratio</u>

The Trustee also argues that Greenwich misrepresented to the
Court the Debtors' ability to operate within the parameters of
the DIP Loan.  The Trustee contends that Greenwich knew that the
Debtors were in default as soon as the loan documents were
executed, because the Debtors could not meet the collateral
coverage ratio in the DIP Loan.  (Ex. C-33 at § 8(aa).)
Specifically, the Trustee claims that Greenwich knew that the
Debtors were overvaluing the I/O Strips, which put the Debtors in
immediate default enabling Greenwich to call the loan at its
discretion.[7]  Therefore, the Trustee argues that Greenwich's

---

     [7]  The Trustee contends that Greenwich knew the value of the
I/O Strips was $91 million, which was less than the $97 million
of liens held by the ITs, in violation of this ratio.

representations to the Court at the final hearing on the DIP Loan
and in a reply brief filed in response to objections to the DIP
Loan that the Debtors were operating within the parameters of the
DIP Loan were false.  (Ex. C-62 at ¶ 15.)

Greenwich disputes this contention noting that it made no
representations to the Court about the value of the collateral;
all evidence was presented by the Debtors at the hearings on the
DIP financing.  (Ex. H-74 at 101; Ex. YY at 85-89; Ex. OO at 13.)
Further, Greenwich argues that the value of the I/O Strips was a
matter of opinion and difficult to ascertain.  In fact, when
Greenwich did declare the Debtors in default, it did not rely on
this as a basis.  (Ex. T.)

The Court agrees with Greenwich that the Trustee has failed
to establish that Greenwich knew, and then misrepresented to this
Court, that the Debtors were not in default of the collateral
coverage ratio at the time the Final DIP Order was entered on
March 10, 2005.[8]  The value of the collateral was a matter of
opinion that was initially heavily contested.  (D.I. 174 at p. 25
¶ t; D.I. 99 at ¶¶ 27, 44.)  The fact that Greenwich had a
different opinion of the value of the I/O Strips is not
sufficient to prove that Greenwich knew the Debtors were in

_____

[8]  Although the Debtors' February projections showed they
may violate the collateral coverage ratio, the Debtors revised
their projections to meet the requirements of the Loan Agreement.
(Exs. C-114 & C-115.)

violation of the collateral coverage ratio.  Further, the fact
that Greenwich did not cite the collateral coverage ratio when it
did declare the DIP Loan in default is evidence of its subjective
nature.  (Ex. T.)

### ii.  <u>Material adverse change</u>

The Trustee also argues, however, that before filing the
Debtors' certification with respect to the Final DIP Order (Ex.
C-70), the Debtors became aware that they were no longer able to
execute their business model because they had lost significant
personnel and origination business.  (App. 10 at 373-76, 488-89,
492-93; App. 11 & 12; App. 13 at 102-04; App. 16; Ex. H-67 at
112; Ex. C-46 at 110-13, 375-76, 383, 492; Ex. C-47 at 117; Ex.
C-63; Exs. C-66 through C-69; Ex. C-72 at 81-84, 88, 104-06; Ex.
OO at 50-51, 110-13, 474; Ex. UU at 114-17.)  The Debtors'
counsel advised Greenwich's counsel (and counsel for the ITs and
the Creditors' Committee) of the business problems and the
Debtors' inability to comply with their business plan.  (App. 11
& 12.)  The Trustee contends that this amounted to a "material
adverse change" (and a default) under the DIP Loan.  (App. 4 at
§§ 5.01(r) & 6.02.)

Greenwich argues initially that these provisions were not an
event of default but were instead representations and warranties
of the Debtors or conditions precedent to extending the DIP Loan.
(<u>Id.</u>)  Those provisions had been met to Greenwich's satisfaction

20

and it did, in fact, make advances under the DIP Loan until April 19, 2005, more than a month after the Final DIP Order was entered.  (Obaditch Decl. at ¶ 4.)  Again, Greenwich did not cite these provisions when it did declare the DIP Loan in default. (Ex. T.)  Greenwich further notes that when the Debtors' counsel advised it of the business problems, it asked the Debtors what they planned to do and the Debtors responded that they intended to move forward.  (Ex. H-67 at 112.)  Greenwich argues that it did not force the Debtors to proceed with the reorganization; it was the Debtors' business decision to make.  (Ex. BBB at 492-93.)

The Court finds that Greenwich did not make any material misrepresentation to the Court about the Debtors' ability to operate.  Once again, Greenwich did not present any evidence at the hearings on the DIP Loan on this issue.  (Ex. H-74 at 101; Ex. YY at 85-89; Ex. OO at 13.)  Further, this issue had been raised by the Creditors' Committee and the ITs, whose objections questioned the Debtors' business plans and ability to operate. (D.I. 174 at ¶¶ 5-6; D.I. 99 at ¶ 43; Ex. CC.)  Before the Final DIP Order was entered, Debtors' counsel advised those parties, as well as Greenwich, of the personnel loss and no one objected to the entry of the Final DIP Order.  (Ex. H-67 at 110-11.)  The Debtors' decision to move forward with the DIP Loan, along with the failure of any party to object, does not constitute a material misrepresentation by Greenwich.

21

Further, the Debtors' decision to proceed notwithstanding the loss of personnel was not unreasonable.  The Debtors felt they still had a shot to reorganize.  (Ex. H-82 at 299-300; Ex. UU at 114-15; Ex. BBB at 110-12; Ex. H-71 at 39.)  Even if they could not reorganize, the Debtors believed that having DIP financing in place would allow them to avoid the chaos that would result if the final DIP financing order was not entered.[9]  (Ex. H-59; Ex. R; Ex. H-57; Ex. H-58; Ex. H-82 at 287; App. 12; App. 13 at 18-20; App. 66.)  The Debtors felt that with the DIP in place, they would at least be able to maximize the value of their assets through an orderly sale.  (Ex. BBB at 94, 101; Ex. H-59; Ex. H-60; Ex. H-71 at 35; Ex. H-85 at 30-32; App. 66 & 67.)  With the consent of the other parties to proceed with the DIP financing, counsel for the Debtors felt that the Debtors were not in violation of the DIP Loan Agreement as of that date.  (App. 10 at 80; Ex. UU at 43; Ex. BBB at 93-94, 496; Ex. H-71 at 41.) The Court concludes that there is no basis for the Trustee's claim that Greenwich misled the Court about the Debtors' prospects.

---

[9]   If the Final DIP Order was not entered by March 9, 2005, the Debtors would be in default of the Interim DIP Order and have to shut down their operations precipitously.  (Ex. BBB at 98-99, 101-03.)

c.    <u>Greenwich's Intent to Lend</u>

Finally, the Trustee argues that Greenwich misrepresented its intent to lend the Debtors the full $500 million under the DIP Loan, yet collected all the fees and interest as if it had. The Trustee cites Greenwich's analysis of future events as evidence that Greenwich knew the Debtors would fail and it would never have to lend the full amount.  (App. 1, App. 2, App. 3, App. 6, App. 7; Exs. C-10, C-23, C-25, C-31, C-34, C-35, C-110 & C-116.)

Greenwich responds that internal predictions about future events which it made for risk-assessment purposes are not probative of its intent to lend and cannot support a fraud on the court claim.  <u>See, e.g.</u>, <u>Great Lakes Chem. Corp. v. Pharmacia Corp.</u>, 788 A.2d 544, 554 (Del. Ch. 2001) ("Predictions about the future cannot give rise to actionable common law fraud.  Nor can expressions of opinion.").

The Court agrees with Greenwich.  Greenwich's analysis and due diligence, including internal predictions about future events, does not demonstrate that Greenwich had no intent to lend the full amount of the DIP Loan.  <u>See</u> <u>Great Lakes</u>, 788 A.2d at 554.  These predictions only show that Greenwich was evaluating all possible scenarios.  It does not support a finding that Greenwich never intended to comply with its obligations under the DIP Loan.  In fact, Greenwich did extend loans to the Debtors in

accordance with the terms of the Interim and Final DIP Orders.
(Ex. C-39; App. 10 at 78-80; Ex. BBB at 93; Ex. OO at 78;
Obaditch Decl. at ¶ 4.)

Further, the DIP Loan was heavily negotiated, at arms length
and in good faith, with the Debtors, the ITs, and the Creditors'
Committee.  (Ex. H-71 at 18-22; Ex. H-70 at 116; Ex. H-74 at 100-
03; Ex. H-85 at 17-18.)   The DIP Loan was even shopped to others
and, with the encouragement of the Creditors' Committee, Wachovia
Bank offered to do a loan on similar terms.  (Ex. H-58.)   After
considering the two alternatives, the Debtors decided to proceed
with the Greenwich DIP Loan, as the better alternative.  (Ex. H-
67 at 39, 98; Ex. H-71 at 24; Ex. H-85 at 27-28.)   While the
Court agreed with the Committee's objection that paying fees on
the entire DIP should not occur until the Final DIP Order was
entered, the Committee did not press any objection to Greenwich's
fees when the Final DIP Order was entered (on a completely
consensual basis).  (Ex. C-37 at 94-95; Ex. C-46 at 47-48; Ex. W;
Ex. C-70.)

4.  <u>Deceived the Court</u>

The fourth element of a fraud on the court claim is that the
Court must actually be deceived by the misrepresentations made by
counsel.  In this case, the Court was not misled by anything that
Greenwich or its counsel presented.  As noted above, Greenwich
did not present any evidence at the DIP hearings.  Its pleadings

24

and statements in support of the DIP Loan were understood by the
Court in the context of the proceedings as the position of the
DIP Lenders.  There were other parties who argued that the
Debtors' value of the I/O Strips was wrong, that the Debtors'
business plan was too aggressive, and that the DIP Loan should
not be approved.  The objections to the DIP Loan were ultimately
resolved consensually and the Court was not required to decide
those issues.  (Ex. C-70.)

The Court was apprised of all the facts at the time it
considered approval of the DIP Loan.  It was not misled by
Greenwich or any of the other partes.  Consequently, the Court
finds that the Trustee has failed to prove that the actions of
Greenwich rise to the requisite level needed to prove a valid
fraud on the court claim.  See Herring, 424 F.3d at 387-89
(discussing the rarity and demanding standard needed to prove a
fraud on the court claim, including proof that the court must
actually be deceived for the claim to succeed); Aoude, 892 F.2d
at 1118.  As a result, the Court concludes that judgment in favor
of Greenwich on the Trustee's fraud on the court count is
mandated.[10]

---

[10]  Greenwich also argues that the Trustee's efforts to
vacate the Final DIP Order are barred by the doctrines of
estoppel and in pari delicto.  Because the Court concludes that
summary judgment in favor of Greenwich is warranted, it is not
necessary to address those arguments.

C.    Common Law Fraud

The Trustee's claim of common law fraud against Greenwich is premised on numerous alleged misrepresentations made by Greenwich to the Trustee in order to obtain the release given in the Consent Agreement reached in July 2005.  (Ex. C-113 at ¶ 3.)

In order to establish a common law fraud claim, a plaintiff must demonstrate each of the following elements: (1) a false representation made by the defendant; (2) the defendant knew or believed that the representation was false or was made with reckless disregard of the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting on the basis of the misrepresentation; (4) the plaintiff did, in fact, act or refrain from acting on the basis of the misrepresentation; and (5) the plaintiff suffered damages as a result of such reliance. Tillman v. Pepsi Bottling Grp., Inc., 538 F. Supp. 2d 754, 783 (D. Del. 2008); Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).

1.    Value of the I/O Strips

The Trustee first asserts that Greenwich misrepresented to him the value of the I/O Strips.  He testified that Dominic Obaditch, a Senior Vice-President of Greenwich, said he agreed with the Debtors' assertion that the I/O Strips were worth $200 to $250 million, which was more than the balance of the DIP Loan due to Greenwich and the pre-petition debt due to the ITs for the

26

collateralized noteholders at the time, thereby allowing a
possible recovery for unsecured creditors.  (Ex. C-85 at 57, 68-
76; App. 37 at 57, 158; Ex. C-116.)  In addition, the Trustee
contends that Greenwich "participated" in the direction of the
ITs to their expert, Michael Trickey ("Trickey"), that he not
tell the Trustee his valuation of those assets.  (Ex. E at 3.)

     With respect to the latter, Greenwich responds that there is
no evidence that it "participated" in any instruction to Trickey.
(Ex. HH at 294; Ex. LL at 328; Ex. RR at 299-302; Ex. SS at 122-
23.)  The Court agrees.  The Trustee admitted that he had no
facts to support this claim.  (Ex. FF at 246.)  According to the
testimony of Susan Storey, the ITs financial advisor, she - not
Greenwich - instructed Trickey to stop his presentation to the
Trustee because of concerns about confidentiality.  (Ex. C-96 at
81-85, 120.)  All the other evidence supports this testimony and
contradicts the Trustee's assertion that Greenwich instructed
Trickey to hide from the Trustee the true value of the I/O
Strips.  (Ex. C-98 at 160; App. 37 at 159; Ex. RR at 239-40, 299-
303; Ex. F.)  The Court, therefore, finds that there is no
evidence to support the Trustee's assertion that Greenwich
instructed Trickey not to tell the Trustee his opinion of the
value of the I/O Strips.

     With respect to the assertion that Greenwich told the
Trustee that it agreed with the Debtors' valuation of the I/O

Strips, Greenwich denies that it made any such affirmative
statement.[11]  (Ex. H-78 at 206-09.)   However, for purposes of the
summary judgment motion, Greenwich says it is not necessary to
decide this fact because there was absolutely no reliance by the
Trustee on any statement of value by Greenwich.

The Court agrees with Greenwich.  The Trustee admitted that
he received numerous conflicting statements about the value of
the I/O Strips.  (Ex. C-85 at 75; Ex. HH at 107; Ex. II at 120-
21.)  As a result, the Trustee was not comfortable relying on
anyone else's valuation and insisted on hiring his own
independent valuation expert.  (Ex. C-85 at 74-76, 184, 221-25,
473-76; Ex. FF at 404-05, 409-11, 811; Ex. HH at 107-09.)  In
fact, the Trustee did hire a valuation expert, before he signed
the release of Greenwich.  (Ex. A at 22-29; Ex. C; Ex. FF at 402-
04, 408-10.)  Therefore, the Court finds that the Trustee did not
rely on any statements that Greenwich might have made about the
value of the I/O Strips.

Further, it would have been unreasonable for the Trustee to
rely on any statements made by Greenwich about the value of the
I/O Strips.  "A hearer has no right . . . to rely on the
speaker's representations as to value, . . . especially where the

---

[11]  There is some suggestion that the Trustee was confused
about whether Obaditch was discussing the expected gross cash
flows from the I/O Strips or their intrinsic value.  (App. 20 at
205; Ex. C-85 at 477; Ex. FF at 402-04, 811.)

relation of the parties is antagonistic; or where the hearer has
made an investigation before acting." 37 C.J.S. Fraud § 91 (2008
online ed.). This is especially true because the alleged
misrepresentation was about the value of the I/O Strips.
"Misrepresentations as to value do not ordinarily constitute
fraud, because they are generally to be regarded as mere
expressions of opinion involving a matter of judgment and
estimation as to which people may differ." Id. That is
particularly true where, as here, the value depended on future
events (the future compliance/default rate of the mortgages in
the securitized pool of mortgages). (Ex. JJ at 27; Ex. LL at
121.) See, e.g., Gordon, 105 U.S. at 557-58 ("Whenever property
of any kind depends for its value upon contingencies which may
never occur, or developments which may never be made, opinion as
to its value must necessarily be more or less of speculative
character; and no action will lie for its expression, however
fallacious it may prove, or whatever the injury a reliance upon
it may produce."); Pascucci, 90 B.R. at 444 ("A representation of
the value of property is a statement of opinion, that does not
support a . . . . claim based on fraud.").

Because the Trustee did not (and could not reasonably) rely
on any statements by Greenwich about the value of the I/O Strips,
the Court concludes that there can be no claim for common law
fraud for any such statements. See, e.g., Bridge v. Phoenix Bond

29

& Indem. Co., 553 U.S. 639, 656 (2008) (noting that reliance is an element needed for common law fraud).

### 2.  Pre-petition Relationship with Debtors

The Trustee contends further that Greenwich defrauded him into approving the Consent Agreement (thereby releasing it of all claims) by falsely representing that Greenwich did not have a pre-petition relationship with the Debtors.  (Ex. C-12 at 241-42; Ex. C-85 at 6-8, 358, 473; Ex. C-111; App. 37 at 55, 59; Ex. P; Ex. FF at 373.)  The Trustee alleges that Greenwich did participate in the loan made to the Debtors by Chrysalis Warehouse Funding, LLC ("Chrysalis") and received funds directly from the Debtors in repayment of that loan.  (Ex. C-19; Ex. FF at 37, 361-64.)

Greenwich responds that it did not misrepresent any facts to the Trustee.  Greenwich was not a lender to the Debtors pre-petition directly or as a participant in Chrysalis's loan to the Debtors, and did not receive any payments from the Debtors in repayment of the Chrysalis loan.[12]  (Ex. K.)  Rather, Greenwich was only a lender to Chrysalis, which the Trustee admits Obaditch told him.  (Ex. C-85 at 6-8; Ex. FF at 5, 364.)

The Court finds no evidence that Greenwich misrepresented its pre-petition relationship with the Debtor to the Trustee.

---

[12]  Greenwich did consider giving a loan to the Debtors in 2003 and was paid for its due diligence, but the loan was not consummated.  (Ex. C-6; Ex. C-35; Ex. O; Ex. FF at 361-64.)

The Trustee has presented no evidence that Greenwich was a lender to the Debtors pre-petition; in fact, the evidence is clear that Greenwich did not participate in the loan Chrysalis made to the Debtors but was simply a lender to Chrysalis itself.  (Ex. K; Ex. LL at 237-44; Ex. KK at 34-37; Ex. MM at 235-37; Ex. C-4 at 34-35; Obaditch Decl. at ¶¶ 2 & 3.)  Being a lender to Chrysalis did not make Greenwich a lender to the Debtors.

Further, the Court concludes that the Trustee could not have reasonably relied on any statements made by Greenwich about its relationship with the Debtors because the Trustee and his advisors had access to (and in fact reviewed) numerous documents that revealed the nature and extent of Greenwich's relationship. (Ex. FF at 27; Ex. GG at 42, 45-49; Ex. HH at 54-55, 61-62, 70-73, 76-77; Ex. II at 15-19, 22-25, 46-47; App. 2 at 2, 85; D.I. 2542; D.I. 2516 at 21 & Ex. A, Pt. 1 at 7; D.I. 24 at ¶ 51; D.I. 285 at ¶ 45; D.I. 186 at 7.)  In addition, that relationship was a matter of public record, having been revealed in the DIP Financing Motion and other pleadings and disclosed on the record at various hearings.  (D.I. 24 at ¶ 51; D.I. 285 at ¶ 45; D.I. 186 at 7; D.I. 134 at 74; D.I. 423 at 86, 94; D.I. 2010 at 9.) This was confirmed by the Debtors' SEC's filings and in the press.  (Ex. L at 3; Ex. M; Exs. AA through DD; Exs. C-14 through C-16.)

31

Therefore, the Court finds no support for the Trustee's common law fraud claim based on any alleged misrepresentation as to the pre-petition relationship (or lack thereof) between Greenwich and the Debtors.   Bridge, 553 U.S. at 656.

　　　3.   Trickey's Relationship with Ocwen

The Trustee also asserts that Greenwich misrepresented and concealed from him the fact that Trickey was Ocwen's Chief Investment Officer.  (Am. Cm. at ¶ 279(e).)  Greenwich responds that, after extensive discovery, the Trustee now admits that Greenwich never made any affirmative statement to him about Trickey's position, but the Trustee simply argues that Greenwich hid Trickey's relationship with Ocwen from him.  (Ex. C-85 at 176-77.)

With respect to the allegation that it hid Trickey's affiliations with Ocwen, Greenwich notes that it had no duty to tell the Trustee about that relationship.  See, e.g., MetCap Sec. LLC v. Pearl Senior Care, Inc., No. Civ. A. 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007) ("a duty to disclose arises when there is a fiduciary or other similar relationship of trust between the parties or where the custom or course of dealing between the parties merits disclosure").  Further, Greenwich contends that the Trustee did not rely on Greenwich's omission because the Trustee knew the details of Trickey's relationship with Ocwen before agreeing to release Greenwich in

32

the Consent Agreement.  (Ex. FF at 403-04.)

The Court agrees that Greenwich had no duty to disclose
Trickey's relationship to the parties.  Greenwich was not a
fiduciary of the estate at the time Trickey was hired.  Further,
Trickey was not hired by Greenwich, he was hired by the ITs.
Even if Greenwich did have some duty to advise the Trustee, the
Court finds that the Trustee knew of Trickey's relationship with
Ocwen before the Consent Agreement was executed: the Trustee
admitted that he was told Trickey had a relationship with Ocwen
by his advisors (and by Trickey himself in June 2005).  (Ex. C-
113; Ex. FF at 190, 403-04, 568, 760, 762, 803, 875-77, 881, 887,
966; Exs. G, H, J, VV; Exs. C-106 & C-110.)  Therefore, the
Trustee could not have relied on any misrepresentation or failure
to disclose by Greenwich.  Bridge, 553 U.S. at 656 (requiring
reliance for common law fraud).  Consequently, the Court
concludes that there are no grounds for a fraud claim based on
Greenwich's alleged failure to disclose Trickey's relationship
with Ocwen to the Trustee.  See, e.g., Harman v. Masoneilan
Int'l, Inc., 442 A.2d 487, 499 (Del. 1982) (for fraud, plaintiff
must be "ignorant of [a representation's] falsity"); Restatement
(Second) of Torts § 541 ("The recipient of a fraudulent
misrepresentation is not justified in relying upon its truth if
he knows that it is false or if its falsity is obvious to

him.").[13]

### 4.   Intention to Sell the I/O Strips

The Trustee argues that Greenwich misrepresented its intentions about selling the I/O Strips.  He contends that Greenwich told him it intended to sell them immediately when it really intended to retain them as long as possible.  (App. 37 at 57, 109, 112; Ex. H-76 at 130-31; Ex. C-85 at 475.)  The Trustee asserts that he would not have authorized the release of Greenwich in the Consent Agreement if he had known Greenwich's real intentions.

The Trustee's contentions are, however, contradicted by the evidence.  First, the DIP Loan required the sale of the whole loans before the sale of the I/O Strips.  (Ex. W at p. 20 ¶ d & p. 53 ¶ 26(d)(i); Ex. H-66 at 19-29; Ex. H-68 at 110; Ex. H-78 at 213; Ex. H-83 at 114; Ex. H-87 at 250.)  This provision was included at the insistence of the ITs to protect their position as junior secured creditors in the I/O Strips.  (Ex. H-66 at 19-20; Ex. H-67 at 45.)  The Trustee was aware of this and he preferred that the assets be liquidated in that order, because he had to continue to operate in order to preserve the value of the

---

[13]  The Court is also not convinced that the relationship between Trickey and Ocwen was material to the decision of the Trustee to release Greenwich.  See Abry Partners V, L.P. v. F&W Acquisition LLC, 891 A.2d 1032, 1050 (Del. Ch. 2006) (noting that there can be no common law fraud without proof of the materiality of the misrepresentation).

whole loans but did not want to do so for longer than necessary.
(Ex. H-68 at 110-12; App. 37 at 111; App. 77.)  The Trustee did
in fact file a motion under section 363 to sell the whole loans,
but that sale was not concluded until August 2005.  (Ex. H-68 at
26; D.I. 1492 & 1992.)

The Trustee further admits that Greenwich's statement that
it intended to sell the I/O Strips "now" occurred during a
conference call with the Trustee on August 30, 2005, after the
whole loan sale had closed.  (App. 37 at 130-33; Ex. C-85 at 487-
88; Ex. H-76 at 130-31; Ex. XX at 163.)  In the middle of that
call, however, the Trustee received a call from the ITs who asked
if the Trustee and Greenwich would consider a global settlement.
(App. 37 at 132; Ex. H-76 at 132-33; Ex. FF at 170.)  The Trustee
asked Greenwich whether it would consider discussing a settlement
and Greenwich agreed.  (App. 37 at 132; Ex. H-76 at 132-33.)

At that time, the ITs did not want Greenwich to liquidate
the I/O Strips, but instead wanted them to be run off because
they believed that would maximize the value of the I/O Strips.
(App. 37 at 112, 227; Ex. H-66 at 12, 16, 24; Ex. H-72 at 18-19;
Ex. H-77 at 66-67; Ex. H-78 at 209-10; Ex. H-83 at 115; Ex. H-87
at 250-52, 294; Ex. RR at 325.)  In part the need to wait before
liquidating the I/O Strips was because the servicing had just
been switched to Ocwen and there was typically a decrease in
value for several months after servicing was switched.  (Ex. H-67

35

at 98; Ex. H-79 at 49; Ex. H-48 at 2; App. 12 at 300.)  In
addition, the consensus of all the advisors (including the
Trustee's) was that the best way to maximize the value of the I/O
Strips was to run them off until a step down or call could be
made which would allow a buyer to own the underlying mortgages by
paying off the bonds.  (Ex. H-48 at 6; Ex. H-72 at 18; Ex. H-79
at 50; Ex. H-83 at 112; Ex. H-88 at 325; Ex. FF at 324; Ex. RR at
320, 325; Ex. TT at 58-59; App. 20 at 280; App. 37 at 117, 457;
App. 38 at 129; Ex. C-77 at 2.)  In fact, the Trustee did not
immediately sell the one I/O Strip which had not been transferred
to Greenwich because, his expert testified, it should be run off
until a step down event.  (App. 41 at 206-07.)

Between early September 2005 and the end of the year, the
ITs and Greenwich continued to discuss various means of
effectuating a settlement, including a run-off of the I/O Strips
until maturity, abandonment of the I/O Strips and placing them
into a special entity, a 363 sale by the Trustee, or a
replacement of Greenwich as DIP lender.  (Ex. 68 at 94, 106-10;
Ex. H-77 at 72-73; Ex. H-78 at 213-14; Ex. H-79 at 51-55, 84-85,
94-95; Ex. H-83 at 116-18, 126-27; Ex. H-87 at 255, 297-300, 342-
44; Ex. H-91 at 116; Ex. NN at 80-82; Ex. RR at 169; App. 22;
App. 31; App. 35; Ex. C-12 at 215-19, 234-35; Ex. C-86, Ex. C-
89.)  In the interim, the Trustee's valuation expert was
preparing a report on the value of the I/O Strips.  (Ex. C-85 at

36

492; Ex. FF at 404; Ex. NN at 78-79; Ex. RR at 169; Ex. C-98 at
170.)  Finally, when the parties were unable to agree on a
settlement, Greenwich again announced its intention to foreclose
on the I/O Strips.  (Ex. H-68 at 27, 103, 113; Ex. H-77 at 72-73;
Ex. H-78 at 214; Ex. H-79 at 181-82, 184-87; Ex. SS at 139; App.
37 at 133.)  Because Greenwich already had relief from the stay,
it did not need a further court order to foreclose.  (Ex. H-68 at
102.)  Ultimately, the I/O Strips were sold by Greenwich to Ocwen
at a foreclosure sale in June 2006.  (Ex. H-36.)

It is clear that the Trustee's assertion that Greenwich
misrepresented its intentions with respect to sale of the I/O
Strips is unsupported by the uncontested facts.  Greenwich stated
its position that it wanted to foreclose on the I/O Strips after
the whole loan sale closed.  It was at the insistence of the
Trustee and the ITs that Greenwich did not immediately do so.
When the settlement discussions among those parties proved
fruitless, Greenwich did in fact sell the I/O Strips at
foreclosure.  The Court finds that there was no misrepresentation
by Greenwich about its intentions to foreclose on the I/O Strips.

Because the Court finds that the Trustee has failed to prove
that Greenwich misrepresented (i) the value of the I/O Strips,
(ii) Greenwich's pre-petition relationship with the Debtors,
(iii) Trickey's relationship with Ocwen, or (iv) Greenwich's
intentions with respect to the sale of the I/O Strips, the Court

37

concludes that the Trustee has failed to establish that Greenwich committed common law fraud in connection with the execution of the Consent Agreement.  Therefore, the Court will grant summary judgment in favor of Greenwich on this count.

      D.   Breach of Fiduciary Duty

To establish a breach of fiduciary duty claim the plaintiff must prove by a preponderance of the evidence that (1) a fiduciary duty existed between the parties, and (2) the fiduciary breached that duty.  Dynamis Therapeutics, Inc. v. Alberto-Culver Int'l, Inc., No. 09-773-GMS, 2010 WL 3834405, at *3 (D. Del. Sept. 24, 2010).

The Trustee asserts that Greenwich acted in bad faith in delaying its foreclosure and sale of the I/O Strips, thereby failing to maximize the value of the I/O Strips.  See Solfanelli v. Corestates Bank, N.A., 203 F.3d 197, 200-01 (3d Cir. 2000) (stating that the creditor breached its fiduciary duty when it sat on the debtor's collateral for more than eleven months post-default before it liquidated it).  The Trustee contends that instead of immediately foreclosing on and selling the I/O Strips in May 2005, Greenwich chose to run off the I/O Strips while charging the default interest rate.  He argues that Greenwich would have been paid in full and additional assets made available for the estate if Greenwich had sold the collateral earlier.  In addition, the Trustee contends that during this period Greenwich

failed to inform him that the I/O Strips were deteriorating in value.

Greenwich responds that a secured lender's obligation to dispose of collateral is to act in a commercially reasonable manner, not perfectly or promptly. See Bankers Trust Co. v. J.V. Dowler & Co., 47 N.Y.2d 128, 134 (N.Y. 1979) ("[T]he touchstone of its obligation as a secured party was to dispose of the collateral in a 'commercially reasonable' manner . . . ."). Greenwich asserts that the Trustee bears the burden of establishing that the sale was not commercially reasonable, which he has not done.

As found in Part C.4 above, the Court concludes that Greenwich only delayed selling the I/O Strips at the request of the Trustee in order to negotiate a possible global settlement among the ITs, Greenwich and the Trustee.  Further, all parties agreed that the way to maximize the value of the I/O Strips was to continue their run-off until a step down or call would allow a buyer to own the underlying whole loans.  (Ex. H-72 at 18; Ex. H-79 at 50; Ex. H-83 at 112; Ex. H-88 at 325; Ex. FF at 324; Ex. RR at 320, 325; Ex. TT at 58-59; App. 20 at 280; App. 37 at 117, 457; H-48 at 6.)  Therefore, the Court concludes that the "delay" in selling the I/O Strips by Greenwich was commercially reasonable.

With respect to whether the actual sale that occurred in June 2006 was commercially reasonable, Greenwich argues that it was under New York law.  <u>See</u> N.Y. U.C.C. § 9-610.  New York has adopted two tests for assessing the reasonableness of the disposition of property: the proceeds test and the procedures test.  The proceeds test focuses on obtaining the optimal price for the collateral, while the procedures test concentrates on the process applied in conducting the sale.

  1. <u>Proceeds test</u>

The Trustee contends that the price received for the I/O Strips was less than it would have been had they been sold in May 2005 and that it was unreasonable for Greenwich not to do so. <u>See</u> <u>Solfanelli</u>, 203 F.3d at 200 (concluding that it was unreasonable for secured creditor to hold stock for 11 months before liquidating it).  The Trustee contends that the value of the I/O Strips deteriorated significantly (from $69 million to $10 to $15 million) between May 2005 and June 2006.  (App. 32; App. 41 at 209, 214.)

Although Greenwich disagrees with the Trustee's assertion that it should/could have sold the I/O Strips in May 2005 and with the value that it could have received at that time if it had, Greenwich contends that it still meets the proceeds prong of the New York standard for commercial reasonableness of a foreclosure sale.  Greenwich notes that the Trustee's expert

opined that the value of the I/O Strips was $69 million in May 2005.  (App. 32.)  The cash flow realized by the I/O Strips before they were sold ($43 million) plus the $5.1 million in proceeds received at the Auction resulted in a total recovery of $48 million.  (Ex. H-44 at 8.)  Therefore, Greenwich contends that its "run off and then sell" strategy realized approximately 70% of what the Trustee's expert opines Greenwich could have received if it had sold the I/O Strips in May 2005.  Greenwich contends that this is sufficient to meet the proceeds test.  See Frank Buttermark Plumbing & Heating Corp. v. Sagarese, 500 N.Y.S.2d 551, 551-52 (N.Y. App. Div. 1986) (holding that a sale that returned 30% of the fair market value was not "so inadequate as to shock the court's conscience" and as such would not be vacated).

The Court agrees with Greenwich.  As found above, Greenwich's decision to delay a foreclosure sale of the I/O Strips while the parties discussed settlement and while the I/O Strips could be run off until a call date, was not unreasonable. At a minimum, the Final DIP Order required the disposal of the whole loans prior to the sale of the I/O Strips.  (Ex. W at p. 20 ¶ d & p. 53 ¶ 26(d)(i).)  Therefore, the I/O Strips could not have been sold before the end of August 2005.[14]  The Trustee's

---

[14]  The Court did not approve the whole loan sale until August 19, 2005.  (Ex. C-80.)

41

expert opined that the value of the I/O Strips at that time was $64 million.  Thus, the total of the "run off and then sell" strategy obtained $48 million, or approximately 75% of the August 2005 value.  Consequently, the Court concludes that even if it was unreasonable to delay selling the I/O Strips past August 2005, the amounts received by Greenwich for the I/O Strips satisfies the proceeds test.  <u>Buttermark</u>, 500 N.Y.S.2d at 551-52 (holding that a sale that returned 30% of the fair market value was adequate to meet the proceeds test).

### 2.  Procedures test

The Trustee asserts as well that the auction fails the procedures test because Greenwich allowed Ocwen to serve as the clearinghouse through which critical information was provided to bidders, while also bidding on the I/O Strips.  (App. 41 at 208.) The Trustee contends that Ocwen chilled the bidding by withholding information (that it garnered while servicing the loans) from other potential bidders.  (Ex. H-76 at 285; App. 48 through 59; Ex. H-90 at 222.)  The Trustee argues that Ocwen's actions resulted in a delay of the Auction and in reduced (or no) bids by others.  (App. 63; App. 64 at 90-93; App. 67.)

Greenwich disagrees, arguing that the critical information requested by bidders was provided in advance of the Auction. (Ex. H-79 at 219-20.)  Additionally, Greenwich notes that the one bidder who complained, Security National ("SN"), could not

42

identify any information that it had not received prior to the
Auction. (Ex. H-80 at 56.) Further, SN did not believe it was
unfair for Ocwen to bid at the Auction. (Ex. H-80 at 56-57.)

The Court concludes that the process for the Auction of the
I/O Strips was commercially reasonable. Greenwich hired a
professional, Obsidian Finance Group, LLC ("Obsidian"), to
conduct the sale. (App. 20 at 198; Exs. H-16 & H-17.) Obsidian,
not Ocwen, ran the sale process, provided notices of the sale,
consulted with the parties (including the Trustee) regarding
prospective buyers, contacted prospective bidders, obtained
confidentiality agreements, provided due diligence material to
prospective buyers, and conducted the Auction. (Ex. H-79 at 120-
68; Ex. H-15; Ex. H-22; Ex. H-23; Exs. H-25 through H-29; Exs. H-
33 & H-34; Delgado Decl. at ¶ 40.) Although some of the
underlying information had to come from Ocwen, because it was the
servicer, that was not unusual. (Ex. H-90 at 440.) Ocwen agreed
to provide the information and Greenwich agreed to pay it a fee
of $35,000 and out of pocket expenses. Ocwen also agreed not to
call any of the underlying loans while the sale process was
underway. (Exs. H-31 & 32; Ex. H-79 at 118; Delgado Decl. at ¶¶
41-42.) Obsidian felt that sufficient information was given to
the bidders and that the complaint by SN was not valid. (Ex. H-
79 at 196.) Further, it was not unusual or unfair for Ocwen to
be a bidder for the I/O Strips, because the servicer is often the

43

most logical buyer for residual interests in the loans it is
servicing.  (Ex. H-90 at 72-73, 437-38; Ex. H-80 at 56-57.)

While one of the unsuccessful bidders complained about the
process, the Court notes that it had participated in the Auction
and bid until the last round, before announcing on the record its
complaint.  (Ex. H-34 at 16.)  The Court concludes that this
alone is not sufficient to find the sale process was unfair.[15]
The sale did not have to be perfect, only commercially
reasonable.  Bankers Trust Co., 47 N.Y.2d at 134.  Consequently,
the Court concludes that the Auction met the procedures test
under New York law and that Greenwich did not breach its
fiduciary duty to conduct the sale of the I/O Strips in a
commercially reasonable manner.

---

[15] The Court often hears such last minute complaints by
disappointed bidders and does not automatically conclude that the
sale process was not reasonable.  In fact, in this case, there
were similar complaints about the sale of the whole loans
conducted by the Trustee.  (Exs. H-4, H-5, H-6, H-8, H-9 & H-83
at 22-25.)  Greenwich was the only one to appear and bid at the
whole loan auction despite numerous expressions of interest.
(Ex. H-68 at 64-66; Ex. H-73 at 82-83.)  Ultimately, another
bidder appeared at the hearing on approval of the sale and
presented another bid.  (Ex. C-80; Ex. H-76 at 276; Ex. H 83 at
27-34.)  The Trustee asserts that Greenwich breached its
fiduciary duty by not credit bidding its entire secured claim for
the whole loans.  (App. 36.)  There is, however, no requirement
that a secured creditor credit bid its entire claim.  See, e.g.,
In re Phila. Newspapers, LLC, 599 F.3d 298, 320-21 (3d Cir. 2010)
(J. Ambro, dissenting) (explaining that right to credit bid up to
the full amount of the secured creditor's claim assures that the
asset is not sold for less than its fair value but noting that
there is no assurance that the secured creditor will bid that
amount, just as there is no assurance that a cash bidder, like
Warren Buffet, will bid all the cash he has available).

E.    Aiding and Abetting a Breach of Fiduciary Duty

The Trustee contends that Greenwich aided and abetted a breach of fiduciary duty[16] by the Debtors' officers and counsel who (1) knowingly misrepresented the values of the I/O Strips, (2) committed to the $500 million DIP Loan when they knew only a fraction would actually be borrowed, and (3) materially misrepresented that they were in compliance with the Loan when in fact they knew there had been a material adverse change and the company was moving toward liquidation.

All of the facts on which the Trustee relies to support this claim, however, occurred before the Final DIP Order was entered (and months before the Consent Agreement was entered). Therefore, the Court concludes that this claim is precluded by the Court's finding that neither the Final DIP Order nor the Consent Agreement was obtained by fraud.  Consequently, the releases granted by the Debtors and the Trustee to Greenwich mandate judgment in favor of Greenwich on this count of the Amended Complaint.  See Parts B and C, supra.

---

[16]    There are four elements of a claim for aiding and abetting a breach of fiduciary duty: "(1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."  Gotham Partners, L.P. v. Hallwood Realty Partners, L.P., 817 A.2d 160, 172 (Del. 2002) (footnote omitted).

        F.   Fraudulent Transfers

     In the Amended Complaint, the Trustee also seeks avoidance

of the sale of the I/O Strips as a fraudulent[17] post-petition

transfer.  11 U.S.C. § 549.  The Trustee argues that the release

granted in the Final DIP Order does not preclude this claim

because it is based on Greenwich's fraud and breach of fiduciary

duties owed to the Debtors which cannot be waived by contract.

The Trustee further argues that the Final DIP Order does not

provide Greenwich with indemnification for fraudulent acts.

(App. 4 at §§ 10.05 & 11.04.)

     Greenwich responds that the Trustee's fraudulent transfer

claim seeks to avoid post-petition transfers, which can only be

avoided if they are unauthorized by the Code or the Court.  11

U.S.C. § 549.  Greenwich contends that the disposition of the I/O

Strips by it at the June Auction was authorized by the Final DIP

Order and thus approved by this Court.  Greenwich further argues

that because it was not a transferee of the I/O Strips sold at

the Auction (and instead was the transferor), it cannot be sued

for that transfer in a fraudulent conveyance action.  See, e.g.,

In re Big Apple Scenic Studio, Inc., 63 B.R. 85, 88 (Bankr.

---

     [17]  In order to avoid a fraudulent transfer, the Trustee must
show that (1) there was a transfer, (2) for less than a
reasonably equivalent value, and (3) the debtor was insolvent.
Del. Code Ann. tit. 6, §§ 1304-05 (1996); 11 U.S.C. § 548.  See
also In re Plassein Int'l Corp., No. 05-51472, 2008 WL 1990315 at
*5 (Bankr. D. Del. May 5, 2008).

S.D.N.Y. 1986) (holding that a defendant who is a transferor
cannot be held liable under section 549).

The Court has found that Greenwich did not commit fraud by
entering into the DIP Loan Agreement.  See Part B, supra.
Moreover, the Court has found no evidence that Greenwich breached
any fiduciary duty in disposing of the I/O Strips.  See Part D,
supra.  The DIP Loan Agreement authorized Greenwich on default to
exercise all remedies it may have against the collateral,
including the I/O Strips.  (App. 4 at § 9.)  Therefore, the Court
concludes that the sale of the I/O Strips by Greenwich in
accordance with New York law was authorized by the Court's entry
of the Final DIP Order and cannot be avoided under section 549.
Accordingly, the Court will grant summary judgment in favor of
Greenwich on the fraudulent transfer claim.

G.    Breach of Contract

The Trustee claims that Greenwich breached[18] the DIP Loan
Agreement when it delayed declaring the Debtors in default,
charged fees on money it never intended to lend, and failed to
liquidate the Debtors' collateral in a commercially reasonable
manner.  To the extent that claim deals with actions taken before
the Consent Agreement was approved, it is barred by the release

---

[18]   A breach of contract claim requires (1) the existence of
a contract; (2) a breach of a duty imposed by that contract; and
(3) damages.  Narrowstep, Inc. V. Onstream Media Corp., No. 5114-
VCP, 2010 WL 5422405, at *7 (Del. Ch. Dec. 22, 2010).

granted by the Trustee to Greenwich.  See Part C, supra.

The Trustee argues, nonetheless, that the claim is not barred because Greenwich acted in bad faith.  Even if Greenwich's right to foreclose was discretionary, the Trustee argues that Greenwich had a duty to exercise its rights under the DIP Loan Agreement in good faith.  The Trustee contends that Greenwich did not act in good faith because the fees paid to it were based on the full loan amount, Greenwich knew that the Debtors would default on the DIP Loan before it had to lend the full $500 million, and it purposely delayed selling the I/O Strips at Auction in order to depress their value.

Greenwich argues that good faith and fair dealing are concepts that cannot override express contractual terms or insert contractual terms to which the parties have not agreed.  The DIP Loan Agreement states that any failure to declare a default cannot later be used to argue that Greenwich should have declared a default earlier.  (App. 4 at § 11.02.)  Moreover, Greenwich asserts that the Trustee has offered no evidence that its alleged delay in declaring a default was the result of Greenwich's bad faith.

The Court agrees that there is no evidence that Greenwich acted in bad faith in the disposition of the I/O Strips.  (See Part D, supra.)  With respect to the assertion that Greenwich acted in bad faith in delaying its declaration of default from

48

April 4 until May 13, 2001, the Court finds a similar lack of evidence.  In fact, Obaditch testified that the delay was because Greenwich was working with the Debtor and if the case was going to be converted, wanted to be sure the records were secured.  (C-12 at 201-02.)  Therefore, the Court cannot find that Greenwich acted in bad faith and the claims are therefore barred by the releases granted to Greenwich by the Debtors and the Trustee. The Court will grant summary judgment for Greenwich on the breach of contract claim.

### H.   Civil Conspiracy

The Trustee contends that Greenwich conspired with the Debtors' officers, directors and counsel to authorize the "sham" reorganization.[19]  The Trustee asserts that all parties involved knew the Debtors had already failed and that approval of the $500 million DIP Loan was unnecessary.  Furthermore, the Trustee contends that Greenwich misled and defrauded him by not identifying the relationship between Trickey and Ocwen.

Greenwich responds that the Trustee offered no evidence that Greenwich conspired in any way with the Debtors' fiduciaries, Ocwen, or Trickey to harm the estate.

_____

[19]  In order to establish a civil conspiracy claim a plaintiff must show "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act committed in furtherance of the conspiracy; and (3) [a]ctual damages" to the plaintiff caused by the conspiracy.  Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987) (citation omitted).

The Court agrees that the Trustee presented no evidence that Greenwich conspired with any party to harm the estate. Further, the Court has already determined that the Trustee's claims against Greenwich related to approval of the DIP Loan and Trickey's relationship with Ocwen have no merit. See Parts B & C, supra.[20] Therefore, the Court will grant summary judgment for Greenwich on the civil conspiracy claim.

I.    Conversion

The Trustee argues that Greenwich is liable for conversion[21] because it retained some of the I/O Strips after it should have liquidated them. Greenwich responds that the Trustee's conversion claim fails for the same reasons as his breach of fiduciary claim: Greenwich had the authority under the DIP Loan Agreement to liquidate its collateral. The DIP Loan has now been paid in full. (Ex. H-44.) However, Greenwich contends that because of the indemnification agreement, it is entitled to be paid for all costs incurred by it in this litigation. (App. 4 at §§ 10.05 & 11.04.)

_____

[20]    In addition, to the extent this claim is based on actions taken before the Consent Agreement was approved, this claim too is barred by the release provided therein to Greenwich.

[21]    Conversion is "an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." Black's Law Dictionary 712 (9th ed. 2009).

The Court has found that Greenwich did not breach any fiduciary duty in failing to liquidate the I/O Strips sooner. See Part D, supra.  Further, because Greenwich had lawful possession of the I/O Strips, there can be no claim for conversion.  See In re Vinogradova, 270 B.R. 159, 172 (Bankr. S.D.N.Y. 2001) ("Where possession of the property is originally lawful, conversion does not occur until a demand to return the property has been made by the plaintiff and refused by the defendant . . . .").  Therefore, the Court will grant summary judgment in favor of Greenwich on the conversion claim.

J.    Accounting

The Trustee contends that he has never received a final accounting from Greenwich on the liquidation of its collateral because it still owns eight I/O Strips which appear to be producing an income stream.  Although Greenwich has provided an accounting, the Trustee asserts that a final cumulative report, under oath, is needed.  (Ex. H-44.)

Greenwich responds that it only has a duty to account to the estate when there is a surplus in the sale of the collateral. See N.Y. U.C.C. Law § 9-615(d)(1).  Because the auction did not result in a surplus, Greenwich maintains it has no duty to report.  In addition, Greenwich argues that although it has possession of the eight remaining I/O Strips, no accounting is required until they are sold.

51

The Court finds that the accounting provided to the Trustee with respect to that collateral was sufficient.  (Ex. H-44.)  See Bezuszka v. L.A. Models, Inc., No. 04 Civ. 7703(NRB), 2006 WL 770526, at *17 (S.D.N.Y. Mar. 24, 2006) (stating that an accounting claim is an equitable remedy that requires a showing of breach of fiduciary duty).  Therefore, the Court will grant summary judgment for Greenwich on the accounting claim.

> K.    Equitable Subordination of Claims

For equitable subordination of a claim there must be a showing of three elements: (1) engagement in some type of inequitable conduct; (2) the misconduct resulted in injury to the creditors or created an unfair advantage to the defendant; and (3) the equitable subordination of the claim must be consistent with the provisions of the Bankruptcy Code.  See, e.g., United States v. Noland, 517 U.S. 535, 538-39 (1996); In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977).

To support his claim for equitable subordination, the Trustee incorporates his allegations of willful misconduct by Greenwich which have been addressed throughout this opinion. Because the Court finds that Greenwich has not engaged in any inequitable conduct and is entitled to summary judgment on all of the substantive counts, the Court will grant summary judgment in favor of Greenwich on the equitable subordination claim.

52

    L.    <u>Declaratory Relief</u>

Similarly, the Trustee seeks a declaratory judgment that he is entitled to relief on all the substantive counts of the Amended Complaint.  Because the Court finds that Greenwich is entitled to summary judgment on all substantive counts, the Court will grant summary judgment in favor of Greenwich on the declaratory judgment claim as well.


IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant the motions for summary judgment filed by Greenwich on all counts of the Trustee's Amended Complaint.

An appropriate Order is attached.


Dated: May 18, 2012           BY THE COURT:


                        Mary F. Walrath
                        United States Bankruptcy Judge